Per Curiam :
This case was referred by the court, pursuant to Pule 45, to Trial Commissioner Lloyd Fletcher for a report of the facts and his recommendation for a conclusion of law. The Trial Commissioner has made his report and recommendation, supported by an opinion, and the case is now before the court on exceptions to the Commissioner’s report, supported by briefs and oral argument. Since the court is in full agreement with the Commissioner’s findings of fact and with his opinion supporting his recommendation, it adopts his findings of fact and opinion and concurs in his recommendation for the conclusion of law to be entered.
The court, however, would like to make a few brief observations of its own.
In our prior decision in this case (121 Ct. Cl. 373) we held that the destination, and not the source, of a corporation’s income was the decisive factor in determining its exempt status. This was in accord with the weight of the authorities, although there were respectable authorities to the *556 contrary. But, in section 301 (b) of the Revenue Act of 1950 (64 Stat. 906, 953), Congress said that the source, rather than the destination, was the determinative factor.
Unquestionably the source of plaintiff’s income was from a trade or business that was carried on for profit. Plaintiff itself carried on no educational or charitable activities, if we disregard what plaintiff did with the profits it made, as we must under section 301 (b) of the Revenue Act of 1950. That it gave all its profits to an educational institution availeth it nothing in the mundane field of taxation, however much the children in our schools have profited from its beneficence. Instead of itself carrying on educational activities, it provided the money for others to do so. Such a corporation lost its exemption after the passage of the Revenue Act of 1950.
The Tenth Circuit Court of Appeals and the District Court came to the same conclusion under comparable facts in Veterans Foundation v. United States, 178 F. Supp. 234; affirmed 281 F. 2d 912.
Plaintiff claims that it is taxable under the Revenue Act of 1950 only on its “unrelated business net income.” “Unrelated business net income” means income not related to a corporation’s charitable or educational activities. But plaintiff had no charitable or educational activities. All these activities were carried on by others. All of plaintiff’s activities were for profit, if we disregard what it did with its profits, as we must under 301(b) of the Revenue Act of 1950.
Since the destination of a corporation’s income is no longer decisive in determining its right to exemption, we must conclude that plaintiff is not exempt. Therefore, plaintiff is not entitled to recover on its claim set out in paragraph 17 of its petition, and the petition as to this claim will be dismissed.
But, for the reasons stated by the Trial Commissioner, plaintiff is entitled to recover on that portion of its claim relating to payments to the State Teachers Colleges for scholarships, and it is entitled to a deduction in 1951 of the fees, for professional services. Judgment will be entered to *557 that effect, with the amount of recovery to be determined pursuant to Buie 38 (c).
It is so ordered.
The Trial Commissioner’s opinion, findings of fact, and recommendation follow:
OPINION OP THE COMMISSIONER
This plaintiff has come to the Court of Claims for the second time ashing that it be held exempt from Federal taxation. The first time it was successful.[1] In the belief that Section 301(b) of the Revenue Act of 1950 (64 Stat. 906, 953) has removed the basis for the court’s first decision, the defendant has again attacked plaintiff’s status for the later calendar years 1951, 1952, and 1953. Defendant says that plaintiff is what has become known in this field of tax law as a “feeder corporation.” If defendant is correct in this assertion, then plaintiff is burdened with the same tax treatment as any ordinary business corporation.
As Judge Littleton pointed out in the first Sico decision, the law prior to 1951 had been rather clearly established that the destination of an organization’s income was more important than the source of its income for purposes of determining exemption from taxation.[2] Experience under this rule, however, showed it to be subject to abuse by those who would subvert its principle into a vehicle for the enjoyment of an unfair competitive advantage in the market place. Thus, a nationwide vendor of macaroni could receive its net profits free of income tax simply because, unlike its com *558 petitors, those net profits were destined to an educational institution;[3] and in like manner, a commercial beach facility could enjoy a tax advantage over its competitors because the net income from its business activities was destined to a charitable organization.[4] The ensuing cry of “unfair competion” [5] fell on sympathetic ears in the 81st Congress which responded with the Revenue Act of 1950.
Insofar as relevant to the present case, the changes made by that Act in the statutory pattern affecting exempt organizations were twofold:[6]
(1) With respect to an organization engaged in carrying on both charitable activities and an active trade or business, Congress established a new concept of “unrelated business taxable income” and imposed a tax upon such income derived from the unrelated trade or business[7] without, however, affecting the basic exemption of the organization.[8]
(2) With respect to a feeder corporation, Congress removed any pre-existing exemption of such an organization by Section 301(b) using the following language:
An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under any paragraph of this section on the ground that all of its profits are payable to one or more organizations exempt under this section from taxation. For the purposes of this paragraph the term “trade or business” shall not include the rental by an organization of its real property (including personal property leased with the real property) .[9]
The plaintiff now claims that it falls within the ambit of change (1) described above and states in its reply brief that it would be “pleased to pay corporate income taxes on any income which it may derive from the operation of a busi *559 ness.”[10] It resists vigorously, however, the present attempt by the Government to remove its exemption status entirely, contending that all its other income (mostly rents and interest) is “passive” and thus beyond the sweep of the unrelated business income tax. The defendant responds that plaintiff is a typical “feeder organization” and, as such, falls precisely within the ban of the statutory language quoted in the description of change (2) above.
In order to determine the impact on this plaintiff of the statutory changes worked by the Revenue Act of 1950, it will be convenient to review briefly the facts regarding plaintiff’s activities even though there has been little significant change therein since the time of the court’s first decision.
The plaintiff is a nonstock, charitable corporation and was incorporated in Delaware originally under the name of The Sico Company. In 1955 the name was changed to The Sico Foundation. The founder of the organization was Clarence Schock who died in 1955. As a young man he had encountered serious financial difficulties in obtaining a college education. As a consequence, he became interested, first in providing direct aid to the public schools of Pennsylvania, and, later, in establishing a means whereby financial aid could be extended to worthy students desirous of obtaining advanced education in the state teachers colleges of Pennsylvania. In 1941 Mr. Schock caused the plaintiff organization to be incorporated and transferred to it controlling stock interests which he owned in several corporations engaged generally in the business of selling and distributing petroleum products. Through the medium of dissolution, the plaintiff acquired the assets of the Schock companies and commenced direct operation of their businesses. As stated in more detail in finding 8, the plaintiff’s organizational facilities, its sources of income, and its business activities were substantially the same during the years in question as those during the period at issue in the prior litigation before the court. However, there was an increase provided for in the number of plaintiff’s directors, a majority of whom were directly asso- *560 dated witb public education, including several presidents of state teachers colleges and a county superintendent of public schools. Plaintiff also changed its manner of distributing its funds for educational purposes from that of making direct payments to local public school districts of Pennsylvania [11] to the establishment of a fairly extensive scholarship program in several state teachers colleges in Pennsylvania. During the three years here involved, plaintiff committed nearly $55,000 in scholarship funds to the participating teachers colleges and actually paid out slightly over $34,200 to the colleges for use in their scholarship awards. The record clearly establishes that these scholarships have served to increase student attendance and hence have resulted in the training of more qualified public school teachers than might otherwise have been true.
Aside from such distribution of its income, however, the main corporate activities of plaintiff have revolved around its petroleum business. Its gross sales of petroleum products were quite substantial, averaging about $5,400,000 per year. Although plaintiff actually lost money in the operation of its petroleum business during the years involved here, this has not been its experience either in the prior periods involved in the first decision, or in most years subsequent to 1953.[12] Offsetting these losses, plaintiff received during the years in question substantial amounts of interest, rent, and other so-called “passive” income.
However, the record establishes that apart from its purpose to distribute its income to state teachers colleges, plaintiff has operated for the primary purpose of carrying on its business of selling petroleum products. This being true, plaintiff must be classified as a feeder organization, and therefore its exempt status was revoked by the enactment of Section 301 (b) of the Revenue Act of 1950, supra, for years subsequent to 1950. Indeed, the court seems to have said as much in its first decision regarding this plaintiff. It held plaintiff “exempt from taxation under the exemption provisions of the statutes in effect frior to the enactment of Section 301 *561 (b), Title III, of the Revenue Act of 1950.”[13] [Italics supplied.]
The danger signal went up again in Knapp Brothers Shoe Mfg. Corp. v. United States, 135 Ct. Cl. 797. In considering the exemption status of a shoe manufacturing corporation whose income was destined to a qualified educational institution, the court remarked at page 801;
There was litigation as to whether section 101 (6), above quoted, granted exemption to a corporation which engaged in a regular commercial business, even though its income was devoted exclusively to one of the purposes named in the statute. In C. F. Mueller Co. v. Commissioner, 190 F. 2d 120, C.A. 3, Sico Co. v. United States, 121 C. Cls. 373, and Southeastern Fair Assn. v. United States, 100 C. Cls. 216, that question was answered in the affirmative. Contra, United States v. Community Services Inc., 189 F. 2d, 421, C.A. 4.
The exemption for such enterprises was eliminated, by section 301 (b) Title III, of the Revenue Act of 1950, 61). Stat. at page 953, 26 U.S.C. (1952 Ed.), sec. 101 (12) (B) (ii).[14] [Italics supplied.]
The warning seems clear enough. But plaintiff argues nonetheless that Section 301 (b) ought not to be applied here because, as plaintiff reads the legislative history of the statute, Congress has aimed at feeder organizations differing materially from plaintiff.[15] The fact that, aside from its business activities, plaintiff earns substantial passive income in the form of interest and rents is pointed to as distinguishing plaintiff from the classic feeder corporation which, typically, is a subsidiary organization devoted exclusively to the *562 conduct of a commercial business and feeding the income therefrom to its parent, an exempt corporation.[16] However, this argument appears to overlook the fact that Congress did not confine the scope of Section 301 (b) to organizations whose excl/usvoe purpose is the conduct of a business; rather the statute speaks of organizations whose “primary purpose” is the conduct of a business. Hence, the statute obviously calls for a broader interpretation than that contended for by the plaintiff. The finding that plaintiff’s primary purpose (aside from its purpose to distribute its income to educational institutions) was the carrying on of its petroleum business brings it fairly within the scope of Section 301 (b).
Plaintiff further insists, however, that a proper statutory interpretation requires a consideration of Section 301(a) (cited in footnote 7, supra), wherein Congress established a new concept of taxing exempt organizations on their “unrelated business net income.” In explaining this new concept, the Senate Finance Committee stated:
The problem at which the tax on unrelated business income is directed is primarily that of unfair competition. The tax-free status of section 101 organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes. Also, a number of examples have arisen where these organizations have, in effect, used their tax exemptions to buy an ordinary business. That is, they have acquired the business with little or no investment on their own part and paid for it in installments out of subsequent earnings — a procedure which usually could not be followed ir the business were taxable.
In neither the House bill nor your committee’s bill does this provision deny the exemption where the organizations are carrying on unrelated active business enterprises, nor require that they dispose of such businesses. Both provisions merely impose the same tax on income derived from an unrelated trade or business as is borne by their competitors. In fact it is not intended that the tax imposed on unrelated business income will *563 have any effect on tbe tax-exempt status of any organization. An organisation which is exempt prior to the enactment of this MU, if continuing the same activities, would still t>e exempt after this Mil becomes law. In a similar manner any reasons for denying exemption prior to enactment of this bill would continue to justify denial of exemption after the bill’s passage. [Italics supplied.] [17]
Plaintiff points to the italicized wording in the above quotation as conclusive in plaintiff’s favor. The argument is that since this court has previously held plaintiff exempt and its activities have remained substantially unchanged, Congress has indicated its intention that the previous exemption shall remain intact with only the unrelated petroleum business income to be taxed in order to avoid an unfair competitive impact on plaintiff’s non-exempt competitors.[18] To accept this interpretation, however, would be to read Section 301(b) right out of the statute. In its first Sico decision, the court observed that by the great weight of authority all organizations such as plaintiff were exempt under the law as it then existed simply because the destination of their income was to exempt organisations. Plaintiff’s argument, therefore, would lead to a result whereby all feeder organizations possessed of exemption by reason of the destination of their income would retain their exemption as such, even after 1951, but would be taxable under Sections 421 and 422 on their unrelated business income. Surely, Section 301 (b) is not to be so emasculated*
When the Senate Finance Committee explained that the new concept of taxing unrelated business income was not intended to affect the exemption of an “organization which is exempt prior to the enactment of this bill,” it is quite clear that the Committee was referring to those organizations which themselves actually performed the ultimate exempt functions, and not those which were exempt merely because their income was destined to charity or education. The latter had already received attention in Section 301(b). Only by treating the two types of organizations as separate and *564 distinct can tbe statutory pattern established by tbe Revenue Act of 1950 be properly understood.
In tbe first Sico decision, tbe court did not grant exemption because plaintiff was itself an exempt educational institution. Clearly, neither then, nor during tbe years involved here, was plaintiff engaged in direct educational activity. It was exempt because it gave its income to organizations which were so engaged, an exemption which it lost when Congress enacted Section 301 (b).
It is fully recognized that, unlike the statutory provisions dealing with deductions from gross income, the exemptions provided for charitable and educational organizations are to be liberally construed in the taxpayer’s favor since they are “begotten from motives of public policy.”[19] This liberal approach, however, must not be stretched to a point where it results in ignoring the realities of a commercial business activity conducted by the organization in question.[20] This plaintiff’s income is spent in furtherance of one of the most honored and important functions of our States. It is a worthy organization indeed. In the light of Section 301 (b), however, if organizations such as plaintiff are to be exempted from taxation, the doing of it should be a legislative act, not a judicial one.
By reason of the recommendation that the court should hold plaintiff a non-exempt corporation, it becomes necessary to give consideration to the alternative contentions whereby plaintiff disputes the disallowance by the Commissioner of Internal Revenue of the scholarship payments and professional fees described in findings 9 and 13, respectively. As to the payments made by plaintiff to the several state teachers colleges for scholarship awards, it would appear that plaintiff has abandoned any possible contention that such payments are deductible by it in full as ordinary and necessary business expenses. Although such a claim ap *565 pears to be stated in general terms in paragraph. 18 of the petition, nothing has been found in the record or briefs submitted by the plaintiff indicating any intention to press the claim. If the assumption is correct that plaintiff has abandoned this claim, presumably it is due to the provisions of Section 28(a) (1) (B) of the Internal Bevenue Code of 1939, which appears quite clearly to preclude any such contention.
It is believed, however, that plaintiff’s scholarship payments are deductible by it as contributions to a State for exclusively public purposes subject, however, to a limitation in amount not exceeding 5 percentum of plaintiff’s net income computed without regard to such deduction. Section 23(q)(l), Internal Bevenue Code of 1939. Although defendant contends that the scholarship awards by plaintiff were, in effect, mere gifts to individual students, the record clearly shows that the payments were made to the state teachers colleges themselves and that plaintiff had no part in the selection of any individual recipient of a scholarship. Accordingly plaintiff seems clearly entitled to deductions in this regard for the years in question as provided in Section 23 (q). Since the record is incomplete with respect to the amounts of any such deductions, it is recommended that they be determined as contemplated by Buie 38(c).
Finally, it is necessary to consider the question of whether the professional fees described in finding 13 were properly deductible, as claimed by plaintiff, in the year 1951, or whether such fees should have been deducted by plaintiff in the year 1950, as contended by defendant. Since plaintiff’s books are kept on an accrual basis, and the services for which the fees were paid were rendered for the most part in 1950, defendant asserts that 1950 is the proper year of deduction even though the payments by plaintiff were made in 1951. Plaintiff asserts that it did not know the amounts payable for these services until bills were received in January 1951, and that, therefore, the proper year of deduction is 1951. Plaintiff is sustained in this contention by the court’s decision in Canton Cotton Mills v. United States, 119 Ct. Cl. 24. There, legal services had been rendered to the taxpayer in 1934, 1935, and 1936, and though there was no dispute that liabilities existed with respect to the services rendered by the *566 attorneys, the amount of the fees was not established until February 1936. The court allowed the accrual-basis taxpayer in that case to deduct the attorneys’ fees in 1936, saying at page. 39:
The Government also contends that the amount of the fee attributable to the services rendered in 1934 and 1935 is not a proper deduction for 1936. As the fees to be paid were not determined and fixed until 1936, this contention is not convincing. Old Colony Trust Associates v. Hassett, 55 Fed. Supp. 629. Moreover, it is doubtful if plaintiff could have deducted any amount for attorneys’ fees in 1935; no fee arrangements had been made by the end of that year and the mere fact that some services had been performed would not establish an accrual. Crown Cork & Seal Co., Inc. v. United States, 4 Fed. Supp. 525, affd., 73 Fed. (2d) 997. The general rule, as deduced from United States v. Anderson, 269 U.S. 422 is that an expense accrues in the year in which all the events occur which determine the liability and fix its amount. If the liability is contingent or its amov/nt unsettled,, the expense does not accrue. [Italics supplied.]
Here the evidence shows that plaintiff did not know the amount of the fees until bills were received around the middle of January 1951. Until that time, plaintiff could not know whether it would agree or disagree as to the amounts charged. The fact that it knew the amount of fees sometime prior to the filing of its 1950 income tax return is irrelevant under the accrual theory of taxation, so long as the amounts were unknown at December 31,1950.
Accordingly, plaintiff was correct in deducting the professional fees in its tax return for the calendar year 1951. The amount of refund to which plaintiff is entitled should be determined pursuant to Rule 38 (c).
FINDINGS OF FACT
1. Asserting that it was an exempt organization under the provisions of Section 101(6) of the Internal Revenue Code of 1939, the plaintiff herein seeks to recover from the defendant Federal income taxes paid by plaintiff for the calendar years 1951, 1952, and 1953, in the aggregate amount of $47,-365.53, together with interest according to law. The major question in the case is whether plaintiff’s previously exempt *567 status was adversely affected by the Congressional enactment of Section 301 of the Revenue Act of 1950. In the event it should be determined that plaintiff lost its said exempt status through enactment of said Section 301, plaintiff claims in the alternative that, in computing net income for the years in question, the defendant illegally and erroneously disallowed as deductions certain student scholarships, professional fees, and employment taxes paid by plaintiff during the years involved.
2. Plaintiff is a Delaware corporation with its principal office in Mount Joy, Pennsylvania. It was incorporated under the laws of Delaware as a nonstock, charitable corporation on December 18, 1941. On September 1, 1955, the plaintiff’s name was changed from The Sico Company to The Sico ’¡Foundation..
3. The exemption status of this plaintiff has been previously considered by the court. In The Sico Company v. United States, 121 Ct. Cl. 373, decided January 8, 1952, the court held that plaintiff was exempt from taxation) under the exemption provisions of the statutes in effect prion to the enactment of Section 301 of the Revenue Act of 195,0.
Prior to that decision, the Commissioner of Internal Revenue had ruled on August 24,1943, that plaintiff was exempt from Federal income tax, but on September 27, 1948, the Commissioner revoked his earlier ruling and held that plaintiff was not entitled to exemption and thereupon would be required to file Federal income tax returns for 1948 and subsequent years. Thereupon, plaintiff filed suit in this court and received the favorable decision aforesaid.
4. As shown by the findings of fact entered in the earlier case, the plaintiff was founded by one Clarence Schock who died in 1955.
As a young man, Mr. Schock had been desirous of obtaining a college education. For family and financial reasons, however, it was necessary for him to leave college at the end of, or during, his freshman year. Thereafter, Mr. Schock looked forward to the time when he might be able to help others to acquire college educations. Sometime prior to the incorporation of the plaintiff, Mr. Schock decided that the best he could do for his community was to help the children *568 of the public schools get something in education in addition to that provided by the tax income of public school districts.
5. During the latter part of 1940, Mr. Schock embarked upon a program designed to accomplish his desires as above described. He was the owner of all the stock of Schock Independent Oil Company, Crane Hook Oil Storage Company, and Eollman Manufacturing Company. As set forth in finding 6 in the previous case, Mr. Schock sold and delivered to the plaintiff corporation all his shares of stock in the corporations mentioned above. Shortly thereafter, the plaintiff dissolved the Schock Independent Oil Company and the Crane Hook Oil Storage Company and took over their respective assets. The plaintiff then commenced the direct operation of the businesses of Schock Independent Oil Company and the Crane Hook Oil Storage Company. In operating these businesses, which plaintiff has carried on substantially unchanged since 1942, the plaintiff maintains a marine terminal at Wilmington, Delaware, where it receives liquid petroleum products in tank ships, and delivers and sells these products chiefly in southeastern Pennsylvania. It sells to consumers, retailers, and wholesalers. Its major volume of business is in Lancaster County, Pennsylvania.
6. Plaintiff’s certificate of incorporation, as amended, provides in pertinent part as follows:
THREE. The objects and purposes for which this corporation is formed, and which are proposed to be transacted and carried on, are any and all activities which have for their objects solely the promotion of public educational, literary and scientific purposes, by the appropriation and application of funds and property of this corporation to and for the exclusive benefit of public schools in any state or states of the United States of America, and any political sub-division thereof, provided no part of the net earnings of the corporation shall inure to the benefit of any member, director or individual of this corporation, but said net earnings shall be used exclusively for the charitable purposes hereinabove set forth.
In furtherance, and not in limitation, of the powers herein conferred and likewise conferred by the laws of the State of Delaware, it is expressly provided that this *569 corporation shall have the following powers and to the same extent as natural persons might or could exercise such powers, viz:
To acquire, receive, purchase, hold, use and enjoy, and to take by gift, grant, devise or bequest, or otherwise acquire, and to own, hold, use and otherwise deal in and with any real estate, personal and mixed property, and any interest therein, whether within or without the State of Delaware, which may be appropriate to enable it to accomplish fully and properly its corporate purpose or purposes; and to grant, bargain, sell, give, exchange, demise, hold, assign, mortgage, pledge, transfer and set over the same, or any part thereof, at pleasure, and generally, to deal therewith as fully and amply as natural persons can do with their own property.
To act as trustee in any case where real, personal or mixed property is received by gift, grant, devise or bequest, in trust, for the objects and purposes herein-above described, in accordance with the terms and conditions of said trusts.
To enter into, make, perform and carry out contracts of every sort and kind, with any person, firm, association, corporation, private, public or municipal, or a body politic, which may be necessary or proper to accomplish the purposes for which this corporation is organized and which are not repugnant to law.
To conduct its business in other states, and to have one or more offices within or without the State of Delaware.
To borrow money for any or all of the purposes for which it is organized, to issue its promissory notes, bonds or other forms of certificates of indebtedness, for the repayment thereof, with interest, and to secure any of its obligations by mortgage, pledge, or deed of trust of or on any of its property, franchises or income.
To elect or appoint and remove officers and agents of the corporation, and to define their duties and fix their compensation.
To make, alter, amend and repeal by-laws, not inconsistent with this certificate of incorporation or with law, for the administration and regulation of its affairs.
To enter into any obligation necessary for the transaction of its ordinary affairs.
To purchase, take by gift, devise or bequest, or otherwise acquire, and to hold shares of stock, or bonds, securities, or evidences of indebtedness issued or created by any other corporation or corporations of this or any other state, and, while the owner thereof, to exercise all the *570 rights, powers and privileges of ownership, including the right to vote thereon.
To have and exercise all of the powers and means necessary or essential to effect the purpose or purposes for which this corporation is organized, including the right and power to conduct and carry on any lawful business with and by means of any property it may acquire and own to the extent necessary and proper for the accomplishment and in aid and support of the purposes for which the corporation is organized.
To draw, make, accept, endorse, discount, execute and issue promissory notes, drafts, bills of exchange, warrants, debentures, and other negotiable or transferable instruments.
FOXTB. This corporation shall not have authority to issue capital stock and is not organized for profit in that no part of the net earnings of this corporation shall inure to the benefit of any member, director or individual of this corporation. The members of this corporation shall consist of the persons hereinafter named as in-corporators and such other persons as from time to time hereafter may become members in the manner provided by the by-laws.
# # ij: # # * *
EIGHT. The direction .and management of the affairs of this corporation and the control and disposition of the property and funds thereof, within the limitations of the corporate purposes, shall be vested in a board of directors, who shall be elected in accordance with the provisions of the by-laws; provided, however, that during the life of Clarence Schock, one of the incorporators above named, the direction and management of the affairs of this corporation and the control and disposition of the property and funds thereof, within the limitations of the corporate purposes, shall be vested in the said Clarence Schock. The board of directors shall be entitled to take, hold, manage, administer, and otherwise to deal in, any funds or property of this corporation, with full power to adopt a corporate seal, to appoint officers, whether members of the board of directors or otherwise, and to employ such persons as may be deemed necessary in carrying on the business of this corporation, with full power and discretion to deal with and spend, any and all funds of this corporation in such manner as in their judgment will solely and exclusively best promote the objects hereinbefore set forth; and to have and use all the powers and authority necessary to promote the objects and carry out the purposes herein- *571 before set forth. Every person who is a director of this corporation shall also be a member thereof; every person who is a member of this corporation shall also be a director thereof; every person who ceases to be a director of this corporation shall thereupon cease to be a member thereof; every person who ceases to be a member of this corporation shall thereupon cease to be a director thereof.
NINE. The by-laws of this corporation shall be adopted and shall be subject to amendment, modification, alteration or repeal by the affirmative vote of a majority of the total authorized number of members of the corporation.
TEN. In case of dissolution of this corporation for any cause whatsoever, its net assets shall be applied, paid over, distributed and used solely and exclusively for educational and charitable purposes of the nature set forth in Article THREE hereof, and no part thereof shall inure to the benefit of any member, director or officer of this corporation. The by-laws of this corporation shall provide the method of distribution of net assets in the event of dissolution, within the limitation of this Article and of Article THREE, and may designate from time to time the public educational institutions upon which the beneficial interest or interests shall devolve in the event of dissolution.
ELEVEN. This Certificate of Incorporation may be amended, modified, altered or repealed only in pursuance of the affirmative vote of a majority of the total authorized number of members of the corporation; provided, however, that no power of amendment, modification, alteration or repeal shall be exercised to defeat the objects and purposes for which this corporation is organized.
7. The by-laws of the plaintiff, as amended November 26, 1952, provide inter alia:
DISTRIBUTION OE FUNDS
Seo. 320. (a) All funds of this corporation, not in the opinion of the Board of Directors, necessary for the proper and efficient conduct of its business and affairs, shall at such time as the Board of Directors may determine, be distributed among, or otherwise made available to the use of such State Teachers Colleges as the Board of Directors shall designate in the territory where the business and affairs of this corporation shall at the time be conducted, and in such amounts to each said State *572 Teachers College as are proportional to the dollar value of business done by this corporation in the service area of each of said State Teachers Colleges. The funds so distributed shall be used by each State Teachers College solely for the purpose of providing scholarships for worthy young high school graduates who are eager and able and need financial assistance to become teachers in the elementary grades of the public schools.
(b) Whenever the school district in which the Borough of Mount J oy is located shall have acquired ownership of the residence located at 37 East Main Street, in the Borough of Mount Joy, presently owned by Clarence Schock and Evetta J. Schock, then out of funds available for distribution to State Teachers Colleges there shall first be paid to said school district the sum of Ten Thousand Dollars ($10,000) per year to be used for maintaining a public library in said residence open to the use of any citizen of the United States of America.
(c) So long as the school district in which the Borough of Mount Joy is located shall continue to own the forty acres of playground located in the eastern end of Mount Joy Borough and in the townships of Mount Joy and Kapho, there shall be paid to said school district out of funds available for distribution among State Teachers Colleges the sum of One Thousand Dollars ($1,000) per year to help to care for this forty acres of playground.
(d) So long as the school district in which the Borough of Mount Joy is located shall continue to own the 1,024 acres of land located near Mount Gretna and surrounding the promontory known 'as “Governor Dick”, which is about to be conveyed to said school district by Clarence Schock, there shall be paid to said public school district out of funds available for distribution among State Teachers Colleges the sum of One Thousand Dollars ($1,000) per year to be used for the care of said 1,024 acres of land located near Mount Gretna and surrounding the promontory known as “Governor Dick”.
(e) In case of dissolution of this corporation, the net assets thereof when converted into cash shall be distributed as follows:
1. One-fourth, but not more than Three Hundred Thousand Dollars ($300,000) shall be paid over to a trustee or directly to the school district in which the Borough of Mount J oy is located, upon conditions that said funds be invested in securities in which it is lawful to invest trust funds, and that the income thereof shall be used for the maintenance of the public library, the forty acres of playground, and the 1,024 acres of land described *573 in sub-section (b), (c) and (d) hereof, in the same proportion for each of said beneficiaries as is indicated in subsections (b), (c) and (d) hereof.
2. The remaining net assets shall be paid over to a trustee or directly to the same State Teachers Colleges among which the last annual distribution of funds of this corporation was made and in the same proportion as then made, upon condition that said funds be invested in securities in which it is lawful to invest trust funds, and that the income thereof shall be used solely to provide scholarships for worthy young high school graduates who are eager and able and need financial assistance to become teachers in the elementary grades of the public schools.
8. During the calendar years involved herein, the plaintiff’s charter and by-laws, the objects and purposes for which it was organized, its sources of income, its management and activities were all substantially identical to those in existence during the period at issue in the prior litigation before this court with the following exceptions:
(a) The plaintiff’s charter and by-laws were amended to increase the number of members of its board of directors from five to nine members. During the years involved, a majority of the members of plaintiff’s board of directors were directly associated with public education. Four of the directors were presidents of state teachers colleges in Pennsylvania, one director was county superintendent of schools in Lancaster County, Pennsylvania, and one director was a member of the board of directors of the Mount Joy Borough School District.
(b) Plaintiff also changed the method and manner of distributing its funds for educational purposes. Until 1951, distributions of funds were made by plaintiff directly to local public school districts in the Commonwealth of Pennsylvania. Commencing in 1951, however, plaintiff began a scholarship program under which funds earmarked for scholarships were distributed by plaintiff to state teachers colleges located in Pennsylvania. The scholarship program thus established by the plaintiff was described by its present president (who is also the president of Millersville State College in Pennsylvania) as being one whereby the funds representing the amount of the scholarship awards were turned over by plaintiff to the respective colleges, which in turn selected *574 the individual recipients of the scholarships and actually administered the funds representing the scholarship awards. The factors established by the plaintiff to govern the grant of a scholarship were threefold, namely, the ability of the applicant to profit from college training, the economic need of the applicant, and a demonstrated interest by the applicant in wishing to teach in the public schools. The respective colleges participating in the scholarship program made the selection of the actual individual students who were to receive the scholarships provided by the plaintiff, and the funds representing the amounts of the scholarships were paid by plaintiff direct to the college involved. All students who enrolled in a teachers college in Pennsylvania were required to sign a form prepared by the State in which they indicated their intention to teach in the public schools of the State for a period of not less than two years.
9. During the taxable years in question, taxpayer’s distributions to public school districts, awards of four-year scholarships, and actual payments in discharge of its scholarship commitments were as follows:

Calendar year Distributions to school districts JPace amount of scholarship awards Actual pay-menta made on scholarship awards

1951___ $14,000.00 $36,000.00 $4,500.00
1952_ 9, 300. 00 12,100. 00
1953_ 9, 000. 00 17, 607. 01
Totals_ 14,000.00 54,300.00 34,207.01
As an example, of the $36,000 face amount of scholarships awarded in 1951, only $4,500 was actually paid out in that year. The balance represented payments to be made by plaintiff during the remaining three years of the scholarship period.
10. Apart from the scholarship program described above, there is no evidence in the record to show that plaintiff was engaged in any other educational functions or activities. It does not appear that the plaintiff employed any teachers or maintained any classrooms or other physical plant for instruction of students.
By providing scholarship funds for the benefit of eligible students who might otherwise be financially unable either to commence, or complete, a four-year college course, how *575 ever, the plaintiff’s scholarship program as described above has served to increase student attendance at state teachers colleges in Pennsylvania. Therefore, the plaintiff’s scholarship program has resulted in the graduation of more qualified teachers for the public schools than there would have been if plaintiff’s funds had been devoted to some other purpose.
11. Plaintiff filed with the District Director of Internal Revenue, Philadelphia, Pennsylvania, timely Federal income tax returns for the calendar years 1951, 1952, and 1953, on Forms 1120, 990-A, and 990-T. The net income disclosed by plaintiff on those returns, without regard to adjustments by revenue agents, was as follows:

Calendar year Net income

1951_$20,354. 68
1952_ 25,326.11
1953_ 16,346.92
The plaintiff did not pay any Federal income taxes on the net income so reported at the time the returns were filed, because plaintiff claimed to be exempt from all Federal income taxes.
12. (a) During the years involved in this proceeding, plaintiff received income from interest, rents, dividends, and capital gains in the following amounts:
Calendar year Interest received Net rents received Dividends received Capital grains realized' Total income from these sources
1951_ $9, 032. 54 $52, 006. 81 $2.10 $61, 041.45
1952- 13,281.33 56,761.47 2.10 70,044.90
1953_ 11,969.73 63,248.71 2.25 $900.00 76,120.69
(b) Also during the years involved, plaintiff operated the petroleum products distribution business described in finding 5 with gross sales, total business income, business deductions, and resulting net losses, as follows:

Calendar year Gross sales Total business income Total business deductions Net loss from Business

1951_$4,908,307.72 $415,191.58 $455,878.35 $40,686.77
1952_ 5, 586, 675. 69 416,628. 77 461,347. 56 44, 718. 79
1953_ 5, 732,271.41 418,473.09 478,246. 86 59, 773.77
(c) The rental income received by plaintiff, as set forth in sub-paragraph (a) above, was derived from the rental to American Oil Company (Amoco) of three large petroleum *576 storage tanks owned by plaintiff at its Wilmington, Delaware marine terminal. The petroleum storage tanks rented to Amoco had a total capacity of 215,000 barrels, which represented 81 percent of plaintiff’s total storage facilities. In arriving at its “net rents received” listed in sub-paragraph (a) above, plaintiff charged 81 percent of its storage facility expenses against the gross rentals received, as indicated by the following table:

1951 1952 1953

Gross rentals received_$59, 521. 97 $63,456. 78 $67,913. 57
Allocated expenses_ 7, 515.16 6, 695. 31 4, 664. 86
Net rents_ 52,006.81 56,761.47 63,248.71
By a schedule attached to Form 990-T filed by plaintiff for each year involved herein, the method used by plaintiff in allocating expenses against gross rentals was described in detail. Plaintiff did not treat net rents thus computed on said schedule as being unrelated business net income of an otherwise exempt organization.
(d) It is found as a fact that plaintiff was operated for the primary purpose of carrying on a trade or business for profit.
13. During the month of January 1951, plaintiff received and paid bills for services rendered by an accounting firm and an engineering firm in amounts aggregating $15,291.65. These bills covered professional services rendered by both firms almost entirely during the calendar year 1950. The plaintiff keeps its books and records and files its tax returns on an accrual basis of accounting. Plaintiff, however, deducted the amounts of the aforesaid bills from its tax return for 1951, although the bills were for services rendered in great part during the preceding year. Plaintiff’s accountant explained that the reason these bills were not accrued by plaintiff during the year 1950 was because, as of the close of that year, the plaintiff did not know the amount of the charges for the services, the bills therefor not having been received until sometime in January 1951.
14. On or about June 13,1955, the District Director of Internal Revenue at Philadelphia, Pennsylvania, proposed deficiencies in Federal income taxes of the plaintiff for the calendar years 1951, 1952, and 1953, on the ground that the *577 net income of the plaintiff was “subject to federal income tax for 1951 and subsequent years, under section 301(b) of the 1950 Eevenue Act * * The Eevenue Agent’s report proposing such deficiencies computed the plaintiff’s net taxable income for the years in question as follows:

Calendar year Net income reported "by plaintiff Disallowed deductions Additional deductions allowed for Pennsylvania State income taxes Net income as adjusted

1951_$20,354. 68 $19, 791.65 $1,481.97 $38,664.36
1952_ 25,326.11 12,100.00 1,352.43 36, 073. 68
1953_ 16,346.92 20, 815.36 1, 339.76 35, 822. 52
The disallowed deductions set forth in the above table were determined by the Eevenue Agent as follows:

1951

Calendar year 1952

1953

Professional fees (see finding 13)_$15,291.65
Scholarship Payments (See finding 9)- 4,500.00 $12,100.00 $17,607.01
Overaccrual of taxes in 1953_ 3,208.35
Totals_ 19, 791. 65 12,100. 00 20, 815.36
15.On or about February 7, 1956, plaintiff paid to the District Director of Internal Eevenue, Philadelphia, Pennsylvania, the amount of $47,365.53 in payment of the deficiencies asserted with respect to the taxable years involved, as follows:

Calendar year Tax Interest Total

1951-$14,122.16 $3,308.46 $17,430.62
1952_ 13,258.31 2, 310. 58 15, 568. 89
1953_ 12,892.72 1,473.30 14,366.02
Total paid_ 47,365.53
16. On or about October 12,1956, plaintiff filed claims for refund of taxes and interest in the amounts of $17,430.62, $15,568.89, and $14,366.02, plus statutory interest, for the taxable years 1951, 1952, and 1953, respectively. On May 3, 1957, these claims for refund were disallowed by registered mail.
17. On July 24, 1957, the plaintiff instituted this suit for the recovery of the above-described amounts, together with *578 interest according to law. The plaintiff is the sole owner of these claims.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover under its claim of exemption as set forth in paragraph 17 of the petition, and as to said claim, the petition is dismissed. The court further concludes that, as to the alternative claims set forth in paragraph 18 of the petition, the plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on February 23, 1962, that judgment for plaintiff be entered for $8,100.83, with interest thereon as provided by law.
On plaintiff’s motion for rehearing, the following per curiam opinion was rendered January 12, 1962:
For the reasons stated in the previous opinion, ante, p. 554, the majority of the court feels that the motion for rehearing herein should be overruled.
It is so ordered.

 In the earlier case the plaintiff was known as The Sico Company. It was held exempt from Federal employment taxes for years prior to 1951 in The Sico Company v. United States, 121 Ct. Cl. 373 (1952), the opinion being delivered for a unanimous court by Judge Littleton. In rejecting the defendant’s contention that, notwithstanding the fact all of plaintiff’s net income was destined to the public schools of Pennsylvania, exemption should be denied because plaintiff was engaged in a commercial business for profit, the court said:
* * * It is sufficient to say that the great weight of authority on the question presented is to the effect that under facts such as are involved in this case, the exemption from taxation granted by the statutes makes the destination of the income, that is, the purpose and object to which it is devoted, rather than its source, the ultimate test of its exemption.

 The Sico Company v. United States, 121 Ct. Cl. 373, 389.

 See C. F. Mueller Co. v. Commissioner, 190 F. 2d 120 (3d Cir. 1951).

 See Roche’s Beach Inc. v. Commissioner, 90 F. 2d 770 (2d Cir. 1938).

 See H.R. Rep. No. 2319, 81st Cong., 2d Sess., p. 36 and Sen. Rep. No. 2375, 81st Cong., 2d Sess., p. 28.

 A lull discussion of tile statutory changes is contained in Sugarman and Pomeroy, “Business Income of Exempt Organizations,” 46 Va. L. Rev. 424 (1960).

 I.R.C. 1939, Secs. 421, 422, added by Ch. 944, Sec. 301(a), 64 Stat. 948 (1950) (now I.R.C. 1954, Secs. 511-513).

 I.R.C. 1939, Sec. 101, added by Ch. 944, Sec. 301(c), 64 Stat. 948 (1950) (now I.R.C. 1954, Sec. 501(b).

 I.R.C. 1939, Sec. 101, next to last paragraph, added by Ch. 944, Sec. 301(b) 64 Stat. 953 (1950) (now I.R.C. 1954, See. 502).

 During each year involved herein, plaintiff has suffered substantial net losses from the operation of its business, and henee the offer to pay tas presumably refers to the possibility of profitable business operations in subsequent years.

 This was the method of distribution employed by plaintiff during the time involved in the prior litigation.

 Plaintiff’s brief, p. 11.

 121 Ct. Cl. 373, 389.

 The court went on to bold that the Knapp Company was entitled to exemption for years beginning prior to January 1, 1S51 because the statute there involved precluded retroactive application of Section 301(b) as to certain educational organizations or hospitals.

 A preliminary question drawn from the literal words of Section 301(b) may be noticed here. The statute removed exemption from organizations conducting a business and feeding their income “to one or more organizations exempt under this section,” namely, Section 101. Plaintiff’s income was paid to state colleges and public school districts which are exempt from Federal income taxes, not entirely because of Section 101, but more specifically because of Section 116 of the 1939 Code and, plaintiff says, as a matter of constitutional law. Prom this, plaintiff infers that it is beyond the technical coverage of Section 301(b). The point does not appear to be well-taten, however, since the recipients of plaintiff’s income are not only exempt under Section 110 as state institutions but also under Section 101(6) as educational institutions.

 Cf. Veterans Foundation v. U.S. 178 F. Supp. 234, aff’d Sept. 12, 1960, 281 F. 2d 912 (10th Cir.) where the taxpayer engaged solely in the conduct of a business and was held nonexempt under Section 301(b) although all its net profits went to charity. Unlike the present case, however, that taxpayer seems to have received no passive, or nonbusiness, income.

 Sen. Rep. No. 2375, supra, pp. 28-29; 1950-2 C.B. 504-5.

 Plaintiff Ras stated its agreement that its business income, if any, should be taxed. Plaintiff’s Brief, p. 8.

 Helvering v. Bliss, 293 U.S. 144; Bohemian Gymnastic Association v. Higgins, 147 F. 2d 774; Samuel Friedland Foundation v. U.S., 144 F. Supp. 74; GCM 21610, 1939-2 C.B. 103. The consequent loss of tax revenues Is generally deemed to be compensated for by tbe corresponding relief to tbe Government from financial burdens incident to tbe promotion of tbe general welfare. See H.R. Rep. No. 1860, 75th Cong., 3d Sess., 19, 20.

 Horace Heidt Foundation v. United States, 145, Ct. Cl. 322, 170 F. Supp. 634; Veterans Foundation v. U.S. supra, note 16.