**C. F. MUELLER COMPANY, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**Nos. 71–1860, 71–1861.**

United States Court of Appeals, Third Circuit.

Argued Sept. 28, 1972.

Decided May 18, 1973.

ful to "express no views at this juncture as to the precise effect of that rule in the context of this case."

Robert E. Frisch, Charles A. Simmons, David M. Stigler, Royall, Koegal & Wells, New York City, for appellant.

Scott P. Crampton, Asst. Atty. Gen., Fred B. Ugast, Acting Asst. Atty., Meyer Rothwacks, Thomas L. Stapleton, Wesley J. Filer, Attys., Tax Division, Department of Justice, Washington, D. C., for appellee.

Before STALEY, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

STALEY, Circuit Judge.

These are appeals from decisions of the Tax Court that certain payments made by appellant C. F. Mueller Company ("Mueller") in the years 1959 through 1963 to the Law Center Foundation ("Foundation") were in substance nondeductible dividend distributions rather than charitable contributions.[1] In order to resolve the questions presented on appeal, we must examine the relationship between Mueller and the Foundation. The following is a summary of the Tax Court's detailed findings in that regard.

On August 21, 1947, Mueller was incorporated under the laws of Delaware for the purpose of benefiting the School of Law of New York University ("law school"). On August 28, 1947, Mueller acquired all of the outstanding stock of a successful business corporation ("old company") which was engaged in the manufacture and sale of macaroni and similar products.[2] The incorporation of

1. C. F. Mueller Co. v. CIR, 55 T.C. 275 (1970). The cases were consolidated below and have been consolidated on appeal.

2. The name of the old company was C. F. Mueller Company, a taxable New Jersey business corporation. The purchase was financed by borrowing $3,550,000 from the Prudential Insurance Co. of America. The amount of capital with which Mueller commenced business was $1,000, an amount contributed by Arthur T. Vanderbilt.

Mueller and the acquisition of the old company were conducted by a group of individuals interested in the law school, including a representative of Arthur T. Vanderbilt who was then dean of the law school. It was thought that Mueller would provide the law school with a steady source of income.

Mueller's certificate of incorporation provides:

"No stockholder shall at any time be entitled to dividends on his shares; nor shall he at any time be entitled to any of the profits or assets of [Mueller]."

The sole distributee of the profits and assets of Mueller was New York University ("university") for the exclusive benefit of its law school. The law school was not a separate corporate entity. It was established as a part of the university, then an exempt organization under the Internal Revenue Code of 1939, § 101(6). The university's interest in Mueller was limited to the extent that it could not compel a distribution since it was not a stockholder.[3]

From the time he became dean, Arthur Vanderbilt sought to improve the law school's physical plant and to widen the scope of legal education at New York University through the establishment of what he termed a "Law Center." Excerpts from administration reports which were cited by the Tax Court succinctly summarize the relationship between the Law Center and the law school.

"The School of Law is the core of the Law Center and the only accredited educational entity; it alone is charged to offer courses leading to professional and graduate degrees. The Law Center program is broader: it is concerned with the whole legal profession, with the administration of justice, with legislation, with the reform and simplification of the law—in short with whatever can be done through law in the public interest.

"The School of Law is the axis and around it revolve, in separate orbits but as part of a system, many subsidiary organizations and vortices of activity. * * *

"The Law Center is a place, a building, a forum; the Law Center program is the master plan for a complex of activities—activities of organizations which are more or less autonomous although not usually separate corporate entities. * * *

"The functions of a Law Center are basically educational, but not within traditional limits. One of the principal objectives is the continuing education of the bar. The methods employed include graduate and advanced professional courses, leading to graduate and specialized degrees, and also intensive courses, institutes, and lectures."

"Many of the activities of the Law Center have a measure of autonomy and, indeed, some are independently incorporated, but all of them are physically located in Vanderbilt Hall, all of them are staffed by members of the School of Law faculty, and all of them have at least an indirect impact on the undergraduate and graduate students in the School of Law. * * * " C. F. Mueller Co. v. CIR, 55 T.C. 275, 290 (1970).

In order to provide funds for the expanding legal role of New York University, Law Center, Inc., was organized It was to serve as a vehicle to obtain financing for the construction of buildings to house law school and Law Center activities without pledging the university's long term credit. The university subscribed for all of the stock in the new corporation and transferred to it a contract for the purchase of land. On October 25, 1948, Law Center, Inc., transferred all of its assets to Law Center Foundation, a tax exempt, nonstock corporation. Shortly thereafter Law Center, Inc., was dissolved.

3. Mueller's stock was held by a voting trust.

Law Center Foundation had been granted an absolute charter on October 15, 1948, by the Regents of the University of the State of New York. The Foundation's charter stated that its purpose was to conduct a variety of activities related to legal education at New York University. See C.F. Mueller Co. v. CIR, 55 T.C. 275, 283 (1970). In the event of dissolution, all of its property was to be transferred to the university. The Foundation was intimately involved with the acquisition and construction of Law Center buildings which when ready for use were turned over to the law school for operation. It solicited funds and granted them to the law school in support of various programs of legal education.

Mueller made payments to the Foundation and to New York University during the years 1959 through 1963.[4] The amounts distributed to the Foundation were deducted by Mueller as charitable contributions under § 170 of the Internal Revenue Code of 1954 (I.R.C.1954).[5] The Commissioner disallowed the deductions, determining that they were in substance nondeductible dividend distributions to the university. The Tax Court agreed.

On appeal two determinations must be made in order to resolve the question whether Mueller's distributions to the Foundation were charitable contributions or dividends. First, it must be decided whether transfers to the university, which possesses the real beneficial interest in Mueller but not legal ownership, may be considered charitable contributions under § 170. If this is answered in the negative, we must decide whether transfers to the Foundation for purposes of this case are transfers to the university and therefore not charitable contributions.

## DISTRIBUTIONS TO NEW YORK UNIVERSITY

Distributions by a corporation to a charitable organization which is its sole stockholder fall within the literal meaning of "charitable contributions" under § 170 and of "dividends" under § 316(a) of the Internal Revenue Code of 1954.[6] An examination of the legislative history of the sections of the code that provide for taxation of the unrelated business income of charitable organizations help to define the nature of the payments in the instant case.

Prior to January 1, 1951, a corporation whose income was destined to be paid to a charitable organization was exempt from Federal income tax. Internal Revenue Code of 1939, ch. 1, § 101(6), 53 Stat. 33; see C. F. Mueller Co. v. CIR, 190 F.2d 120 (C.A.3, 1951). Congressional concern with the effect these tax-free enterprises had on their competitors resulted in the passage of what are now §§ 502, and 511–515 of the In-

4. The following amounts were distributed:

| | To the University for the Benefit of the Law School | To the Foundation |
|---|---|---|
| 1959 | $220,000 | $85,000 |
| 1960 | 220,000 | 85,000 |
| 1961 | 175,000 | 75,000 |
| 1962 | 225,000 | 85,000 |
| 1963 | 275,000 | 115,000 |

5. Section 170 provides:
"(a) Allowance of Deduction.—
(1) General Rule.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.
    *     *     *     *     *
"(b) Percentage limitations.—
    *     *     *     *     *
(2) Corporations.—In the case of a corporation, the total deductions under subsection (a) for any taxable year shall not exceed 5 percent of the taxpayer's taxable income * * *."

6. Section 316 provides:
"(a) General rule.—For purposes of this subtitle, the term 'dividend' means any distribution of property made by a corporation to its shareholders * * *."

ternal Revenue Code of 1954.[7] Section 502 provides that an organization is not exempt merely because all of its profits are payable to an exempt organization.[8] Section 511 imposes a tax on the unrelated business income of charitable organizations.[9]

The charitably-run business does have available to it a charitable deduction just as any other business. See I.R.C. of 1954, 26 U.S.C. § 512(b)(10). And no statute specifically prohibits the charitable organization from retaining the income itself and claiming the § 170 deduction. However, the Senate Report on the Revenue Act of 1950 clearly states that "[t]he contribution, whether made by a trust or other exempt organization, must be paid to another organization to be allowable." U.S.Code Congressional & Admin.News 1950, p. 3168. This position has been adopted by the Commissioner. 26 C.F.R. § 1.512(b)–1(g)(3); see Rev.Rul. 68–296. We believe the Commissioner's position in this regard is the correct one.

Although the report refers to a directly held business, courts have reasoned that the same rule applies to separately incorporated feeder organizations. See Crosby Valve & Gage Co. v. CIR, 380 F. 2d 146 (C.A.1), cert. denied, 389 U.S. 976, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967); Dave Investment Co. v. CIR, 462 F.2d 1373 (C.A.9, 1972); Sid Richardson Carbon & Gasoline Co. v. United States, 416 F.2d 867 (C.A.5, 1969). According to the Senate Report, the tax treatment of income should not differ merely because income is earned directly rather than by a subsidiary.[10] The Crosby court applied this reasoning to the tax treatment of charitable contributions.

"Whether the charity operates the business directly or through a subsidiary, the economic and competitive implications of allowing a deduction for income that in fact is retained by the charity would be the same." Crosby, supra, 380 F.2d at 149.

Appellant Mueller disagrees with the Crosby analysis. It contends that the Crosby court erred in extending the limitation on charitable contributions applicable to § 511 organizations to § 502 feeder organizations. Mueller maintains that had Congress intended to achieve this result it would have enacted a separate provision relating to charitable contributions of feeder organizations. Appellant Mueller urges that the failure of

---

7. "The problem at which the tax on unrelated business income is directed is primarily that of unfair competition. The tax-free status of section 101 organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes. Also, a number of examples have arisen where the organizations have, in effect, used their tax exemptions to buy an ordinary business." U.S.Code Congressional Service, p. 3081 (1950). See Revenue Act of 1950, ch. 994, § 301, 64 Stat. 947 (now Int.Rev. Code of 1954, §§ 502, 511–515).

8. Internal Revenue Code of 1954, 26 U.S.C. § 502, provides:

"§ 502. Feeder Organizations

An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation. * * *"

9. Internal Revenue Code of 1954, 26 U.S.C. § 511, provides:

"§ 511. Imposition of tax on unrelated business income of charitable, etc., organizations

(a) Charitable, etc., organizations taxable at corporation rates.—

(1) Imposition of tax.—There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) a normal tax and a surtax computed as provided in section 11. * * *"

10. "[I]t is difficult to see why a difference in tax treatment should be allowed merely because in one case the income is earned directly by an educational or charitable organization, while in the other it is earned by a subsidiary of such an organization. In both cases the income is derived from the same type of activities and disposed of in the same manner." U.S.Code Congressional Service, p. 3081 (1950).

Congress to deal with this matter in the Tax Reform Act of 1969 bolsters this position.[11] We are not persuaded by this reasoning. The *Crosby* decision, as well as *Knapp*, infra, and *Richardson*, had been decided at the time Congress passed the 1969 Act. Silence of Congress under these circumstances does not express a congressional displeasure with *Crosby*.

Mueller cites SICO Foundation v. United States, 295 F.2d 924, 155 Ct.Cl. 554 (Ct.Claims 1961), reh. den., 297 F.2d 557 (1962), as determinative of the issue in this case. We disagree. It is distinguishable from the instant case and *Crosby* in that the income of the feeder corporation considered there was "for the exclusive benefit of public schools in any state or states of the United States of America," rather than a single beneficiary.

■ That Mueller is held in a voting trust does not make *Crosby* inapplicable to this case. Just such an argument was made and rejected in United States v. Knapp Brothers Shoe Mfg. Co., 384 F.2d 692 (C.A.1, 1967), cert. denied, 390 U.S. 989, 88 S.Ct. 1182, 19 L.Ed.2d 1293 (1968). There the court held that payments directed by voting trustees of a feeder organization to a university which was the sole distributee of all profits and assets were dividends rather than charitable contributions. We adopt the reasoning of the *Knapp* court.

### DISTRIBUTIONS TO THE FOUNDATION

■ The Tax Court held that Mueller's contributions to the Foundation were to be treated as contributions to the university. The court stated:

"[W]e are fully satisfied on the entire record as indicated by our detailed findings in this respect that the foundation was merely an instrumentality of the university, organized and operated exclusively for the benefit of the law school in the light of its expanded and expanding role in legal education as reflected by the new label (Law Center) with which it was identified. The payments to the foundation were thus for the exclusive benefit of the university and must therefore be treated as though they were made directly to the university." C. F. Mueller Co. v. CIR, 55 T.C. 275, 304 (1970).

This determination was based on the reasoning underlying taxation of constructive dividends.

A taxpayer who is a shareholder has been held to have received a constructive dividend when he receives an economic benefit through a diversion of corporate earnings and profits. CIR v. Riss, 374 F.2d 161 (C.A.8, 1967); CIR v. Makransky, 321 F.2d 598 (C.A.3, 1963); Holsey v. CIR, 258 F.2d 865 (C.A.3, 1958). Distributions to others as well as direct distributions have been held to be equivalent to dividends. Makransky, supra, 321 F.2d at 601; Holsey v. CIR, supra; Byers v. CIR, 199 F.2d 273 (C.A.8, 1952), cert. denied, 345 U.S. 907, 73 S.Ct. 646, 97 L.Ed. 1343 (1953); see Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940). That a formal dividend declaration was not made is not determinative of the dividend equivalency issue. Simon v. CIR, 248 F.2d 869 (C.A.8, 1957). The nomenclature used in a transaction may be considered, but it is not controlling. Estate of Taschler v. United States, 440 F.2d 72 (C.A.3, 1971). "The net effect of the transac-

---

11. The 1969 amendments removed certain discrepancies in the treatment of feeder organizations and directly run businesses. Appellant argues that Congress by failing to enact legislation dealing with the problem in the instant case manifested its intent that the charitable deductions claimed in this case were available. The Tax Court could find no such intent. We believe the Tax Court's analysis with respect to this argument is correct. See C. F. Mueller Co. v. CIR, 55 T.C. 275, 301 (1970).

**684**

tion is at least an important consideration in determining dividend equivalency." United States v. Carey, 289 F.2d 531, 537 (C.A.8, 1961).

The Tax Court's treatment of Mueller's contributions to the Foundation as being made to the university does not require a finding that the former was not a viable corporate entity as appellant contends. Indeed, all that is necessary is a finding that the payments were for the benefit of the School of Law. See Makransky, supra; see 1 Mertens § 9.08 (1973). The record amply supports the Tax Court's finding that the Foundation operated for the benefit of the law school.

■ Appellant argues that because New York University was not one of Mueller's shareholders, the latter's distributions to the university cannot be considered constructive dividends. It is true, as appellant contends, that the constructive dividend cases brought to our attention involved situations where a shareholder caused its corporation to distribute its assets for the shareholder's benefit. However, as we have already determined, the fact that Mueller's stock is held in a voting trust does not prevent distributions made directly to the university from being considered dividends since the latter is the sole beneficial owner. It follows, therefore, that distributions made by Mueller for the university be considered constructive dividends.

■ Whether a corporate distribution is equivalent to a dividend is a question of fact to be determined by the Tax Court. Ferro v. CIR, 242 F.2d 838 (C.A.3, 1957); Cleveland v. CIR, 335 F.2d 473 (C.A.3, 1964). We cannot say that the Tax Court was clearly erroneous. CIR v. Duberstein, 363 U.S. 278, 80 S. Ct. 1190, 4 L.Ed. 1218 (1960).

The judgment of the Tax Court will be affirmed.