C. F. MUELLER COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 3734-65, 1985-66.    Filed November 9, 1970.

*Robert E. Frisch* and *Charles A. Simmons*, for the petitioner.
*Owen A. Knopping*, for the respondent.

The Commissioner determined the following deficiencies in petitioner's Federal income tax for the calendar years 1959 through 1963:

| Year | Deficiency |
| --- | --- |
| 1959 | $44, 200 |
| 1960 | 44, 200 |
| 1961 | 39, 000 |
| 1962 | 44, 200 |
| 1963 | 59, 800 |

The only question presented for decision is whether certain payments made by petitioner to the Law Center Foundation were deductible as charitable contributions or whether they were in substance nondeductible dividend distributions to or for the benefit of New York University.

### FINDINGS OF FACT

The parties have stipulated certain facts, which, together with the attached exhibits, are incorporated herein by this reference. Among the stipulated facts are those set forth in the opinions in *C. F. Mueller Co. v. Commissioner*, 190 F. 2d 120 (C.A. 3), reversing 14 T.C. 922, which was litigated by the parties herein. The facts as found in that case are also incorporated by reference and will be reiterated here where helpful to a better understanding of the issue presently under consideration.

Petitioner C. F. Mueller Co. (Mueller) is a corporation organized under the laws of the State of Delaware. At all times relevant to the proceedings herein, it has maintained its principal place of business in Jersey City, N.J. Mueller filed corporate income tax returns for the

calendar years 1959 through 1963 with the district director of internal revenue at Newark, N.J.

Mueller was incorporated on August 21, 1947, for the purpose of benefiting the School of Law of New York University (the law school). On August 28, 1947, Mueller acquired, with borrowed funds, all of the outstanding stock of C. F. Mueller Co., a New Jersey corporation, hereinafter referred to as the old company. The old company had been a taxable business corporation, successfully engaged in the manufacture and sale of macaroni and similar products. On the date of its acquisition, the old company merged into Mueller, and since that time Mueller has carried on the business formerly conducted by the old company.[1]

The incorporation of Mueller and the acquisition of the old company were carried out by H. T. Sorg, representing Arthur T. Vanderbilt, then dean of the law school, and a group of other persons interested in the school. Vanderbilt and his associates expected that Mueller would be a steady source of income in the future which would be of great benefit to the law school and to a number of related programs.

Mueller's certificate of incorporation, as modified on March 25, 1948, provided in part as follows:

First: The name of the corporation (hereinafter sometimes referred to as the "Foundation") is

C. F. Mueller Company

\*       \*       \*       \*       \*       \*       \*

Third: The Foundation is organized exclusively for charitable, scientific, literary and/or educational purposes and no part of its income or property shall inure to the private benefit of any stockholder, director, or officer, or any individual or corporation other than New York University for the exclusive benefit of its School of Law. The directors shall from time to time distribute to New York University for the exclusive benefit of its School of Law such part of the property and/or net income of the Foundation as they may determine and as may legally be distributable. The Foundation shall not in any way directly or indirectly engage in carrying on propaganda or otherwise attempt to influence legislation.

Fourth: The objects for which the Foundation is formed:

To manufacture, buy, sell, deal in and deal with, import and export macaroni, spaghelli [sic], vermicelli, alphabets, fancy pastes, noodles, egg noodles, biscuits, crackers, cakes, pastry, confections and all like and kindred food products, to manufacture, prepare for market, market and sell the same; including the

---

[1] "[Mueller] \* \* \* financed the purchase by borrowing $3,550,000 from the Prudential Insurance Co. of America. The loan was to be repaid within 15 years. \* \* \* The loan agreement \* \* \* required that 75 percent of the income of [Mueller] \* \* \* be used to reduce the loan to $1,500,000 and thereafter that further payments be made, and provided, in effect, that the payments or other distributions to New York University could not exceed 25 percent of the excess of the net earnings over the net losses of [Mueller] \* \* \* until the debt was paid."

C. F. Mueller Co., 14 T.C. 922, 923–924, reversed 190 F. 2d 120 (C.A. 3).

acquisition by purchase, manufacture or otherwise of all materials, supplies and other articles necessary or convenient for use in connection with and in carrying on the business herein mentioned or any part thereof;

To produce, purchase, sell and deal in butter, cheese, eggs, milk, grain and cereals of every kind and to manufacture, buy and sell flour and other food articles manufactured from grain and cereals; and

To buy and sell, can, preserve, prepare for market and market all kinds of fruits and vegetables and to manufacture and sell all kinds of food articles made therefrom.[2]

\*    \*    \*    \*    \*    \*    \*

Fifth: The amount of the total authorized capital stock of the Foundation is $1,000 divided into 10 shares of the par value of $100 each. The amount of capital with which it will commence business is $1,000.[3]

\*    \*    \*    \*    \*    \*    \*

Ninth: (a) The directors shall have power by the affirmative vote of a majority of the board, included in which majority shall be at least two of the Class A directors, to make and to alter or amend the by-laws; to fix the amount to be reserved as working capital; and to authorize and cause to be executed, mortgages and liens without limit as to the amount, upon the property and franchises of the Foundation.

(b) The directors shall have authority, with the consent in writing, and pursuant to a vote of the holders of two-thirds of the capital stock issued and outstanding to dispose, in any manner, of the whole property of the Foundation.

\*    \*    \*    \*    \*    \*    \*

(e) Distributions of income or property of the Foundation may be made to New York University although one or more of the stockholders, directors or officers of the Foundation may be connected or associated with New York University in some capacity.

\*    \*    \*    \*    \*    \*    \*

(g) No stockholder shall at any time be entitled to dividends on his shares; nor shall he at any time be entitled to any of the profits or assets of the Foundation. The profits or assets of the Foundation available for distribution shall be paid from time to time, at the discretion of the directors, to New York University for the exclusive benefit of its School of Law; and in the event of the liquidation, dissolution, or winding up of the Foundation, whether voluntary, involuntary or by operation of law, except as may otherwise be provided by law, the directors of the Foundation shall, after payment of all creditors, distribute the assets of the Foundation to New York University for the exclusive benefit of its School of Law.[4]

---

2 "The certificate contained a detailed statement of the usual powers of a business corporation which [Mueller] * * * was to have. Those objects [quoted above in article Fourth] and powers are almost identical with those of the old company."

*O. F. Mueller Co.,* 14 T.C. at 924.

3 "[Mueller's] * * * capital of $1,000 was contributed by Vanderbilt, who considered it a contribution to New York University."

*O. F. Mueller Co.,* 14 T.C. at 925.

4 "The merger agreement [between Mueller and the old company] contains statements similar to those in [Mueller's] * * * articles of incorporation in regards to its purposes and objects. It provides that the profits or assets available for distribution are to be paid from time to time at the discretion of the directors to New York University for the exclusive benefit of the law school and that the assets are also to be distributed to New York University for the exclusive benefit of the law school in case [Mueller] * * * is terminated."

*O. F. Mueller Co.,* 14 T.C. at 924.

Mueller's bylaws, as effective on September 9, 1964, made the following provisions with regard to directors:

Section 1. The direction and management of the affairs of the Foundation and the control and disposal of its property and funds shall be vested in a board of directors which shall consist of seven members. The board of directors shall have, in addition to the powers and authority expressly conferred upon it by the Certificate of Incorporation and these By Laws, the right and power and authority to exercise all such powers and do all such acts and things as may be exercised or done by the Foundation as a corporation organized under the Delaware Corporation Law.

Section 2. The board of directors shall consist of seven persons elected annually by the stockholders; four of the directors shall be Class A directors and three shall be Class B directors. Any director elected by the directors as in these By Laws provided shall serve until the next annual election or until his successor shall have been elected and shall qualify, or until his death, or until he shall resign.

Section 3. Each director shall hold office until his successor shall have been elected and shall qualify, or until his death, or until he shall resign.

Section 4. Vacancies among the Class A directors, whether caused by death, resignation or any other reason, shall be filled by the affirmative vote of two-thirds of the Class A directors.

Vacancies among the Class B directors, whether caused by death, resignation or any other reason shall be filled by the affirmative vote of two-thirds of the Class A directors.

Section 5. Each Class A director shall be a student, a former student, or a graduate, or a member or former member of the faculty, or an officer or former officer of administration of the School of Law of New York University.[5]

By virtue of a voting trust agreement, dated August 28, 1947, and modified on March 25, 1948, all 10 shares of Mueller stock were held by a voting trust. Pertinent provisions of the agreement, as modified, were as follows:

WHEREAS, C. F. Mueller Company has been organized for charitable and educational purposes and for the exclusive purpose of benefiting the School of Law of New York University, a charitable and educational institution in the City of New York, State of New York; and

WHEREAS, the Stockholders acquired their shares only to further the purposes of the C. F. Mueller Company and not for their own private gain; and

WHEREAS, on August 28, 1947 the parties hereto entered into a Voting Trust Agreement in order to better accomplish the purposes of C. F. Mueller Company; and

WHEREAS, the by-laws of C. F. Mueller Company have been amended to provide for a board of directors of five persons of which three shall be Class A directors and two shall be Class B directors; the Class A directors to be a student, a former student, or a graduate, or a member or former member of the faculty, or an officer or former officer of administration of the School of Law of New York University; and

---

[5] Secs. 4 and 5 were in effect throughout the years in issue. The record does not clearly disclose whether the first three sections were altered during or after this period, although it does appear that the size of the board of directors was increased from 5 to 7 members at some time after 1963.

WHEREAS, John Gerdes, Dudley L. Miller and H. Edward Toner, have been elected as Class A directors and Thomas McKay and Winthrop A. Short as Class B directors; and

WHEREAS, it is the belief of the parties hereto that it is to the best interest of the C. F. Mueller Company and of the School of Law of New York University that the exclusive right to vote the shares of stock heretofore deposited under the Voting Trust Agreement of August 28, 1947 and the beneficial ownership in said shares be vested in the Class A members of the Board of Directors of C. F. Mueller Company; and

WHEREAS, it is deemed advisable that the Voting Trust Agreement of August 28, 1947 be modified, altered, changed and amended to that end:

Now THEREFORE, in consideration of the foregoing and of the mutual promises and covenants herein contained the parties hereto agree and covenant as follows:

The Voting Trust Agreement of August 28, 1947 annexed hereto be and the same hereby is modified, altered, changed and amended to read as follows:

1. John Gerdes, Dudley L. Miller and H. Edward Toner, Class A members of the Board of directors of C. F. Mueller Company are hereby designated as Trustees of the Voting Trust hereby declared and created, which Voting Trust shall continue for the term of ten years from August 28, 1947.

2. The parties hereto do hereby direct that the beneficial ownership in the ten (10) shares of C. F. Mueller Company represented by stock certificate No. 16 be divided as follows:

| | |
|---|---|
| John Gerdes | 3 shares |
| Dudley L. Miller | 4 shares |
| H. Edward Toner | 3 shares |

3. Each individual Trustee designated in this agreement or acting as successor to a designated trustee, and each person who has deposited shares under this agreement or succeeding him as beneficial owner of deposited shares, shall continue as such Trustee and as such owner of the beneficial interest in the shares, only so long as he remains a Class A director of the C. F. Mueller Company. If, and when, he ceases to be a Class A director of C. F. Mueller Company, for any reason whatsoever, he shall automatically cease to be a trustee hereunder, and shall also automatically cease to have any beneficial interest in any shares deposited hereunder. The person elected as his successor on the board of directors shall automatically succeed him as trustee hereunder and as owner of his beneficial interest in the shares.

\* \* \* \* \* \* \*

6. The Trustees in office on May 1, 1957, collectively, shall be deemed to have such beneficial interest in the trust and the shares deposited hereunder as will enable a majority of them to extend the duration of this voting trust agreement for such additional period as may be permitted by the laws of Delaware. If extended, this voting trust agreement may be further extended from time to time, if permitted by the laws of Delaware, by action of a majority of the Trustees in office on the first day of May immediately preceding the termination of the extension then in effect.

7. Upon the termination of this agreement and of the last extension thereof, the shares of stock shall become the property of New York University and certificates representing said shares shall be delivered to it.

The voting trust was subsequently extended beyond its original term of 10 years and was in effect throughout the period here in issue.

The law school was not separately incorporated, but was part of New York University (the university), then an exempt organization under the provisions of section 101(6), I. R. C. 1939. The university was a nonsectarian educational institution and received no financial support from either the City or the State of New York. Soon after Arthur Vanderbilt became dean of the law school in 1943, he asked the university for funds to finance a "law center." At that time the law school's physical facilities were quite limited; the university had no dormitories in the Washington Square area of New York City, where the law school was located, and the law school's academic building was an unsuitable "old factory building." Moreover, the law school's curriculum was, at least in Dean Vanderbilt's opinion, too "legalistic," rigid, and narrow. Furthermore, the major portion of the law school's student body was comprised of commuting students from the greater New York metropolitan area, and, again in Dean Vanderbilt's judgment, the law school had only a limited impact upon the nation's legal profession.

Dean Vanderbilt concluded that the law school was not what it could and ought to have been. He envisioned it as a national school, attracting students from throughout the United States and graduate students from throughout the world, and influencing and improving the nation and its legal profession. He thought that the law school's curriculum should be expanded and enriched to embrace activities related to law reform, judicial administration, and political participation. He sought an improvement in the school's physical plant, including dormitory facilities so that students from outside the New York metropolitan area could be housed with little difficulty. By providing a more attractive administration and classroom building as well as a student body drawn from the entire country, it was anticipated that prospective law professors would consider the law school a more desirable place in which to teach. Dean Vanderbilt's proposal for the Law Center was the product of this vision. As such it was a multidimensional concept; it embraced the physical, curricular, and intellectual expansion of the law school, the establishment of innovative programs which would benefit the legal profession, and the attraction of new students from throughout the world. In addition, the term "Law Center" was designed to change the "image" of the law school. The "Law Center" title was intended to signify to law school alumni and to the profession in general that the law school's mission had changed, that it was becoming a new, exciting, and innovative institution, and that contributions in support of its efforts would therefore be both welcome and worthwhile. In essence, therefore, the Law Center was designed to enhance both the quality and the prestige of the law school.

In the Report of the Dean of the School of Law for the Year 1947–48, dated August 31, 1948, Dean Vanderbilt took the occasion of his "fifth and final annual report" to the chancellor of the university "to summarize the achievements on several fronts toward the realization of the objectives of the Law Center." Among the programs and other accomplishments described were the following: (1) The growth and development of the graduate division of the law school, from 10 courses in the spring of 1944 to 55 courses in the spring of 1948, including courses in international law, comparative law, taxation, criminal and welfare law, and practice; (2) a variety of colloquia at which speakers had expressed their views to groups of lawyers and interested laymen on such subjects as "The Citizen's Participation in Public Affairs," "Inheritance and the Power of Testamentary Disposition" (from the respective points of view of anthropology, economics, sociology, and ethics), and the duties and activities of justices of the peace;[6] (3) the Inter-American Law Institute, which brought Latin-American lawyers to the law school to study common law subjects; and (4) the Citizenship Clearing House, which was designed to introduce young college graduates to public leaders in their communities in order to encourage them to participate in local politics.

In addition, the report described the progress which had been made toward the construction of a new building to house the Law Center:

Title to the block at the southwest corner of Washington Square, bounded by Fourth, McDougal, Third, and Sullivan Streets, was acquired in June, thanks to the generous co-operation of the University through the Chancellor and the Council. For well over a year Eggers and Higgins, architects, with Dr. Fiske Kimball, Director of the Philadelphia Museum of Fine Arts as consulting architect of the University, have been working intently on plans and specifications which have involved innumerable conferences with the Law School authorities. For one hundred and thirteen years the School of Law has been located on Washington Square. It is appropriate, therefore, that its new building is to be erected there and that its architecture blend with that of the landmarks which still adorn the Square on the north. The Georgian Colonial design and texture of the new building with its red brick walls and its limestone trim will not only seem like an old neighbor to those who cherish Washington Square, but to the legal mind and the historian it will be a constant reminder of the place of the law in the achievement and preservation of Anglo-American freedom, with a court reminiscent of the old Pump Court of the Inner Temple and its arcade recalling the colonnades of Independence Hall and of the buildings designed for the University of Virginia by Thomas Jefferson. The plans for the building have been filed and approved; the actual work of construction awaits only the relocation of the present tenants and the letting of contracts.

Also included in Dean Vanderbilt's report were a number of sketches of the exterior and interior of the projected building. Dean Vanderbilt

---

[6] A 2-day conference of justices of the peace was held for the purpose of reviewing with the judges their duties, proper conduct of a trial, and the correct use of required forms.

attributed much of the progress which had been made to the generosity of 2,820 alumni and several foundations. He reported that a total of $1,797,894 had been paid in or pledged and that of that amount, $238,596 had been raised during the past 12 months. These amounts were raised notwithstanding the university administration's reluctance to permit a campaign in its name on behalf of the law school in view of the fact that it was engaged in an ambitious fund-raising campaign for its medical school and its concern that a second campaign might undermine its efforts in behalf of the medical school.

In addition to the funds thus realized for the law school and the Law Center, it was contemplated that further funds in a substantial amount would be required to construct the new plant. Vanderbilt encountered certain difficulties in this connection because the university administration was then unwilling to increase its outstanding mortgage indebtedness.

Eventually, Vanderbilt and the administration agreed to finance the new building by organizing a new corporation. The university would contribute the land or cash with which to purchase the land, and the corporation would raise and, if necessary, borrow such additional funds as would be required to finance the construction of the new physical plant which would house the law school and related Law Center facilities. It was also contemplated that in the future the corporation would provide funds for a variety of law-related projects like those which had previously been sponsored under the auspices of the law school.

On May 14, 1948, pursuant to the agreement between Vanderbilt and the university administration, Law Center, Inc., was organized under the laws of the State of New York. The university subscribed for all of the stock in the new corporation, paying $970,000 in cash and transferring to it a contract with Columbia University for the acquisition of certain land on Washington Square. It was contemplated that the cash would be used to pay for the land and that the property would become the site of the Law Center building. Subsequently to its incorporation, Law Center, Inc., purchased the Washington Square property and negotiated loan commitments from the Prudential Insurance Co. for the purpose of providing the funds for the construction of the Law Center.

Law Center, Inc., was formed solely as a vehicle to obtain financing for the construction of the Law Center building without pledging the long-term credit of the university. It was contemplated at all times that after procurement of the loan commitments and before the beginning of construction, the corporation's assets would be transferred either to the university or to another tax-exempt organization.

Pursuant to that plan, on October 15, 1948, the Regents of the Uni-

versity of the State of New York granted an absolute charter to Law Center Foundation (the foundation). The charter provided as follows:

THIS INSTRUMENT WITNESSETH That the Board of Regents for and on behalf of the Education Department of the State of New York has granted this absolute charter, incorporating Arthur T. Vanderbilt, James L. Madden, Paul H. Hudson, W. Paul Stillman, George W. Whiteside and Russell D. Niles and their associates and successors as an educational corporation under the corporate name of Law Center Foundation, to be located in the city, county and State of New York, with power in the corporation to conduct its operations in any of the states, territories and dependencies of the United States or in the District of Columbia, subject, however, to the laws of such foreign state, territory, dependency or district.

The purposes for which such corporation is formed are:

a. To provide building space, equipment and facilities for the School of Law and for other divisions and units of New York University, an educational corporation, and to provide dormitory facilities for students and members of the faculty of said University

b. To acquire and maintain libraries on law and related subjects

c. To aid legal education and research

d. To aid in improving professional and ethical standards

e. To aid in improving the standards of public service and to encourage participation in public affairs

f. To aid in improving the quality of legislative research and draftsmanship

g. To aid by way of education the cause of international law and international cooperation.

h. To grant scholarships and fellowships to worthy undergraduate and graduate students, scholars and research workers, in preparation for careers in the legal profession or in public service

i. To make grants for educational purposes which are related to law and and government.

j. To conduct institutes, conferences and symposia on matters relating to law law and government

The persons named as incorporators shall constitute the first board of trustees, to serve until their successors are elected by the Council of New York University. Said Council shall from time to time determine the number of trustees, to be not more than 25 nor less than five, shall elect trustees to office, fix their terms of office, and fill any vacancy in the office of trustee which may occur.

The corporation hereby created shall be a nonstock corporation organized and operated exclusively for educational purposes, and no part of its earnings or net income shall inure to the benefit of any individual; and no officer, member or employee of the corporation shall receive or be entitled to receive any pecuniary profit from the operations thereof, except reasonable compensation for services.

The principal office of the corporation is to be located in the city, county and State of New York.

In the event of the dissolution of the proposed corporation, any and all property belonging to such corporation shall be transferred to New York University or to such educational organization or organizations as the Council of said University shall determine, subject, however, to the approval of the Supreme Court of the State of New York, as provided by law.

On October 25, 1948, Law Center, Inc., transferred to the foundation all of its assets subject to the foundation's assumption of all its lia-

bilities. The assets transferred consisted of $31,636.92 in cash, real estate valued at $1,002,981.33, and a building (not otherwise identified) valued at $2,119.04. On February 15, 1949, Law Center, Inc., was dissolved.

By application dated March 8, 1949, the foundation requested a determination from the Commissioner of Internal Revenue that it was an organization exempt from Federal taxation. The application contained the following questions and answers (in italics):

2. Is the organization the outgrowth or continuation of any form of predecessor? *No.* * * *

\*     \*     \*     \*     \*     \*     \*

4. State briefly the specific purposes for which the organization was formed. (Do not quote from, or make reference to, the articles of incorporation or by-laws for this purpose.) *To provide building space, equipment and facilities for the School of Law and for other divisions and units of New York University, and to provide dormitory facilities for students and members of the faculty of said University.*

\*     \*     \*     \*     \*     \*     \*

8. State all sources from which the organization's income is derived. *Up to present small part from rents from buildings which are to be razed in order to erect a school building. Other income from donations.*

\*     \*     \*     \*     \*     \*     \*

10. State all the activities in which the organization is presently engaged. (Explain in detail, using additional sheets as required—See footnote.) *Building a Law Center for New York University.*

With the application was submitted an affidavit signed by Paul H. Hudson, secretary-treasurer of the foundation. It declared, in part, as follows:

5. The activities in which Law Center Foundation has engaged since the date of its incorporation include the acquisition of a parcel of real estate in the City of New York, N.Y., bounded by Washington Square South, MacDougal, West Third Street and Sullivan Street; the relocation and removal of the tenants therein; the letting of a contract for the demolition of all the buildings in said square block; the filing of plans with the Building Department of the City of New York for the *erection on said block of a building to house the School of Law of New York University.* The plans for future activities in furtherance of the purposes set forth in our charter include *the removal to the new building when completed of the School of Law of New York University* from its present location at 32 Waverly Place in the City of New York, *and conducting the School in such new building and the removal and conduct of the Graduate School of Law and the establishment and conduct of various Law Institutes and conducting related activities all under the general supervision of the Council (governing body) of New York University* [7] *by which Council all Trustees of Law Center Foundation are elected annually.*

---

[7] The Council of New York University later became the university's board of trustees and will sometimes hereinafter be referred to as such.

6. It is contemplated that the building when completed will remain the property of *Law Center Foundation which is closely affiliated with New York University by reason of the fact that by provision of the charter of the Foundation the University elects the Trustees of the Foundation, fixes their terms of office and fills any vacancies which may occur, and that in the event of the dissolution of the Foundation any and all property belonging to the Foundation must be transferred to New York University or to such educational organization or organizations as the Council of the University shall determine*, subject to the approval of the Supreme Court of the State of New York, as provided by law.
[Emphasis supplied.]

By a letter dated November 23, 1949, the Deputy Commissioner ruled that the foundation was exempt from Federal taxation under the provisions of section 101(6), I.R.C. 1939, relying upon evidence presented that it was "organized and operated exclusively for educational purposes." [8] Similar letters were also secured from the deputy tax commissioner of the Department of Taxation & Finance, State of New York, in 1955 and the assistant to the special deputy comptroller of the City of New York, in 1948, relating to State and City taxes, respectively.

The bylaws of the foundation made the following provisions with regard to the office, trustees, and officers of the corporation:

### ARTICLE I

#### OFFICES AND CORPORATE SEAL

Section 1. Until further order of the board of trustees, the principal office of the foundation shall be at the offices of the School of Law of New York University, Washington Square, New York, N.Y.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### ARTICLE II

#### TRUSTEES

Section 1. The direction and management of the affairs of the foundation and the control and disposal of its property and funds shall, subject to the provisions of these by-laws, be vested in a board of trustees which shall consist of fifteen trustees, to be elected by the Council of New York University each year at its annual meeting.

Section 2. All vacancies among the trustees whether caused by death, resignation or any other reason, shall be filled by the Council of New York University.

Section 3. Any trustee may be removed either with or without cause at any time by vote of the Council of New York University.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

[8] The letter also stated: "Contributions made to you are deductible by the donors in arriving at their taxable net income in the manner and to the extent provided by section 23(o) and (q) of the Internal Revenue Code, as amended, and corresponding provisions of prior revenue acts."

### ARTICLE IV

#### OFFICERS

Section 1. The foundation shall have a president, an executive vice president, a vice president, a secretary, a treasurer, and such other officers as may from time to time be appointed by the board of trustees. The president shall be chosen from among the trustees. Any two offices other than the offices of president and secretary may be held by the same person. Vacancies shall be filled by the board of trustees.

Section 2. The officers shall hold office until their successors are chosen and qualify in their stead. Any officer may be removed either with or without cause at any time by vote of the board of trustees.

### ARTICLE V

#### POWERS AND DUTIES OF OFFICERS

Section 1. The president shall be the chief executive officer of the foundation. He shall preside at all meetings of the trustees. He shall have general supervision and direction of the business and affairs of the foundation.

Section 2. The executive vice president shall be vested with all powers and required to perform all the duties of the president in his absence or disability, and he shall perform such other duties as may be prescribed by the board of trustees. The vice president shall be vested with all powers and required to perform all the duties of the executive vice president in his absence or disability, and he shall perform such other duties as may be prescribed by the board of trustees.

\*    \*    \*    \*    \*    \*    \*

### ARTICLE VII

#### REAL PROPERTY

Section 1. The foundation shall not sell or lease for a term of more than three years any of its real property unless approved by vote of the Council of New York University and authorized by the vote or written consents of at least two-thirds of the whole number of trustees of the foundation then in office.

After the assets of Law Center, Inc., had been transferred to the foundation, a fund-raising campaign was conducted to raise funds to help finance the construction of the Law Center building. The record does not clearly disclose whether this campaign represented a new effort or a continuation of the prior fund-raising activities described in Dean Vanderbilt's final report. The fund-raising effort was an official university campaign and was conducted in its name.[9] Contributors were given the option of making their donations either to the university or to the foundation. However, since the foundation was intended to be the organization responsible for construction of the building, all contributions made to the university were transferred by the uni-

---

[9] A campaign conducted in the name of the university would seem to be at odds with the university administration's fear that such a campaign would impair its current efforts on behalf of the medical school.

versity to the foundation. The campaign raised somewhat in excess of $2 million including amounts already accounted for in Dean Vanderbilt's report.

During 1948 Dean Vanderbilt resigned from his position at the law school to become Chief Justice of the Supreme Court of New Jersey. In early 1950, while the Law Center building was under construction, the council of the university designated it as "Arthur T. Vanderbilt Hall." It will hereinafter be referred to as Vanderbilt Hall.

In order to provide additional financing for Vanderbilt Hall, the foundation also obtained a loan in excess of $3 million, secured by a mortgage on the building. The foundation was primarily liable for the annual payments to be made on the loan. However, the university guaranteed the payments, and there was an informal understanding that Mueller's dividend distributions to the university would in some way be used to contribute to those payments. As a result the university was able to help finance construction of Vanderbilt Hall without reflecting liability for the full amount of the loan on its financial statements—a practice, the propriety of which was by no means clear—and thus avoided the result which would have occurred if it had granted Dean Vanderbilt's original request for direct financial support.

When Vanderbilt Hall was completed, the foundation turned it over to the university for the operation of the law school and related functions under an "arrangement" characterized in the nature of a "lease." The "rent" paid by the university was in amounts equals to those necessary to maintain the building and make the annual payments on the loan which had financed its construction. The university relied, at least in part, upon distributions from Mueller as a source from which to make such payments. It was contemplated that once the loan had been repaid, the foundation would transfer title to Vanderbilt Hall to the university, and by the time of the trial herein the loan was almost fully repaid.

The foundation subsequently purchased a second building in the Washington Square area to be used as a dormitory for law school students and financed the construction of adjoining residential, dining, and social facilities. The building was named "Hayden Hall." Initially, the foundation contracted with the seller, a hotel company, to operate Hayden Hall as a dormitory. However, after the university established other residence halls in the area, the foundation entered into an agreement under which the university operated Hayden Hall just as it operated the other dormitories, and the students living there paid their rent directly to the university. Like Vanderbilt Hall, Hayden Hall was subject to a mortgage. And although the record does not disclose whether the university guaranteed the foundation's payments with respect to the Hayden Hall mortgage, it does appear that

there was an informal understanding with the university that distributions from Mueller to the university would also be used to help pay off this loan. It was also contemplated that when the loan had been fully repaid, the foundation would transfer title to Hayden Hall to the university.

In addition to financing the law school's new physical plant, the foundation also began to sponsor a number of Law Center programs, some of which had previously been supported by the law school. Among the programs which had already been initiated and which had been conducted in the past under the auspices of the law school were the Inter-American Law Institute and the Citizenship Clearing House.[10] Also financed by the foundation were the following Law Center programs: The Root-Tilden Scholarship Program, which awarded large scholarships for study at the law school to students displaying promise as future leaders both at the bar and in public life; the Institute of Comparative Law, which was designed to give instruction in American law to foreign lawyers, to give instruction in foreign law to American lawyers, and to sponsor research and publication in the field of comparative law at the school; and the Seminar for Appellate Judges, an annual summer program for Federal and State appellate court judges addressed to problems of judicial administration and craftsmanship.[11] In addition, the foundation financed the acquisition of books for the law school's library which were of an unusual nature or which for other reasons could not be financed out of the budget established for the law school by the university. The foundation also provided funds to pay the salaries of research assistants for the law school's professors who were writing books and the moving expenses of certain highly sought-after newcomers to the law school's faculty.

The programs financed by the foundation were generally comparable to those offered by other progressive law schools in the United States. However, some of them went beyond established university policies. For instance, at least at its inception, the Root-Tilden Scholarship Program departed from university policy in two respects: the awards included a substantial living allowance in addition to the

[10] The Report of the Dean of the School of Law for the Year 1957–1958 (p. 18) announced that during 1957–58 academic year the Citizenship Clearing House had "achieved an independent status as a tax-exempt educational corporation chartered by the Board of Regents of the State of New York." The dean's reports also stated that the program's headquarters would continue to be Vanderbilt Hall and that it would continue to be directed by a member of the law school faculty. During the academic year, 1961–62, the Citizenship Clearing House was renamed the National Center for Education in Politics.

[11] The seminars were originally sponsored by the foundation, but were eventually taken over by the Institute of Judicial Administration. The institute had also originally been a foundation-sponsored program, but in approximately 1952, it was separately incorporated. Its headquarters were located in Vanderbilt Hall, and law school professors served as its directors. The institute has funded a number of empirical studies of problems in judicial administration and law enforcement.

usual tuition remission and were not made on the basis of the applicant's need.

The foundation generally sought to provide only "seed" money for the programs it financed, so that the programs could develop under its sponsorship, but eventually attract financial support from other sources and no longer depend upon foundation financing.

The headquarters for each program sponsored by the foundation was located in Vanderbilt Hall, and many of the activities relating thereto were also conducted in that building. The Root-Tilden scholars attended the law school there, as did the participants in the Inter-American Law Institute and the Institute of Comparative Law. The Seminars for Appellate Judges were also held in Vanderbilt Hall. On the other hand, many of the conferences, workshops, and seminars sponsored by the Citizenship Clearing House were conducted on college campuses and elsewhere throughout the United States.

The complex of activities located in Vanderbilt Hall was called the "Law Center." Such activities included not only traditional undergraduate law school courses but also a number of graduate programs in such fields as tax law, food and drug law, and labor law, as well as various other programs sponsored by the foundation.

The foundation itself did not conduct any of the programs it financed. Its activities were confined to soliciting funds—primarily from other charitable foundations—and granting them to the law school or members of its faculty. The sponsored programs were staffed largely by members of the law school's faculty and student body. The law school itself, for instance, offered the Root-Tilden Scholarships to undergraduate applicants, and a law school professor served as the director of the program.[12] The directors of the Inter-American Law Institute and the Institute of Comparative Law were members of the law school's faculty, and participants in those programs were instructed by regular law school faculty members, visiting professors, teaching fellows, and guest lecturers. Similarly, the directors of the Citizenship Clearing House and the Seminars for Appellate Judges were members of the law school faculty, although the participants in these programs were largely students and teachers of politcial science and members of the judiciary,[13] respectively.

---

[12] During the 1959-60 academic year the process by which Root-Tilden scholars were selected was reorganized by Assistant Dean George H. Williams of the law school. Thereafter, selection was conducted by a committee assigned to each Federal judicial circuit. Ordinarily, each committee consisted of the chief judge of the United States Court of Appeals for that circuit, the chairman of the Federal Reserve Board serving the area, a member of the law school faculty, and a former Root-Tilden scholar (and hence a law school alumnus) who was designated as secretary. The secretary was responsible for interviewing and screening the applicants within his jurisdiction.

[13] Eminent Federal and State appellate judges served on the "faculty" for the Seminars for Appellate Judges. However, their participation was uncompensated, except for a small honorarium to cover expenses, and they were supplemented by regular members of the law school's faculty.

The foundation had no full-time employees of its own, although it did employ a part-time bookkeeper. Its officers were unpaid, and thus, with the exception of the bookkeeper, the foundation did not have a payroll. Likewise, the foundation had no office of its own. Its records and books were kept in a filing cabinet by the foundation's secretary-treasurer. During the years in issue that position was held by Miguel de Capriles, then associate dean of the law school, who kept the records and books in his law school office in Vanderbilt Hall.

Many of the publications issued by the university and by the law school suggest the nature of the foundation's relationship to the university and the law school. Annually during the academic years 1947–48 through 1963–64 (a period spanning both the inception of the Law Center and the last of the years here in issue), the Report of the Dean of the School of Law described the current status of Law Center activities, along with that of traditional undergraduate law school programs. This publication will hereinafter be referred to as the dean's report.

In the dean's report for the year 1950–51, Dean Russell D. Niles summarized the relationship between the law school and the Law Center as follows:

The School of Law is the core of the Law Center and the only accredited educational entity; it alone is chartered to offer courses leading to professional and graduate degrees. The Law Center program is broader: it is concerned with the whole legal profession, with the administration of justice, with legislation, with the reform and simplification of the law—in short with whatever can be done through law in the public interest.

The School of Law is the axis and around it revolve, in separate orbits but as part of a system, many subsidiary organizations and vortices of activity. * * *

The Law Center is a place, a building, a forum; the Law Center program is the master plan for a complex of activities—activities of organizations which are more or less autonomous although not usually separate corporate entities. * * *

The functions of a Law Center are basically educational, but not within traditional limits. One of the principal objectives is the continuing education of the bar. The methods employed include graduate and advanced professional courses, leading to graduate and specialized degrees, and also intensive courses institutes, and lectures.

The dean's report for the year 1957–58 emphasized the reciprocal benefits derived by the law school and the Law Center programs as a result of their relationship:

Many of the activities of the Law Center have a measure of autonomy and, indeed, some are independently incorporated, but all of them are physically located in Vanderbilt Hall, all of them are staffed by members of the School of Law faculty, and all of them have at least an indirect impact on the undergraduate and graduate students in the School of Law. * * *

The Law Center's effect upon the law school's relationship to the

university and to the legal profession were discussed in the dean's report for the year 1962–63:

It is apparent in many law schools that the educational philosophy is changing. Law Schools are reexamining their relationship with the profession, with the other departments of the university, and are even beginning to consider how law school training can be better coordinated with the whole process of the education of a lawyer from the time that he enters the univesity until he becomes a mature and competent practitioner.

The School of Law of New York University, in implementing the Law Center idea, has been a leader in bringing the resources of the university law school to bear on many problems confronting the legal profession. Educational opportunities have been afforded to judges, law teachers, and practitioners. Several programs are unique, such as the seminar for appellate judges and the advanced professional courses for younger lawyers in various specialties.

The School of Law has also been active, although not preeminent, in the interdisciplinary approach to legal and national problems. For some years faculty members from other disciplines, political scientists, economists, and sociologists, have had joint appointment in the School of Law and in other University departments. * * * A law school without the stimulation, support, and criticism supplied by other branches of a university would be too narrowly professional and would not train students adequately for their public and professional responsibilities. The trend over the next few years is unmistakably in the direction of interdisciplinary approaches to problems and to closer collaboration among the members of various university faculties.

From 1948 until the time of the trial herein, the university has published a bulletin, which at various times was entitled "The Bulletin of New York University Law Center" and the "New York University Law Center Bulletin." This publication served as the law school's alumni bulletin, and was also distributed to other members of the bar and prospective students. In addition to reporting news of law school alumni and faculty, the bulletin described the activities of Law Center programs which had been financed by the foundation.

The university's "Official Directory" did not list the foundation during the years in issue. However, it did list the law school, the Inter-American Law Institute, the Institute of Comparative Law, the Citizenship Clearing House (later the National Center for Education in Politics), the Institute for Judicial Administration, and their respective officers and directors and addresses and telephone numbers.

The university's annual financial report for the fiscal years 1960–61 through 1963–64 listed the members of the foundation's board of trustees, along with the members of the university's board of trustees and the board of trustees of New York University Medical Center.[14]

---

[14] Unlike the foundation, the Medical Center was not granted a separate charter and was simply a division of the university, established under a 1950 amendment to the university's charter by the New York State Legislature. See 1950 N.Y. Laws, ch. 756, secs. 1–3. Nevertheless, during the years here in issue, the Medical Center was listed in the then "Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954," currently designated as Publication No. 78 of the Department of Treasury, Internal Revenue Service.

However, for the fiscal years ending August 31, 1960, through and including August 31, 1964, the foundation issued its own annual financial statements which were prepared by a firm of certified public accountants and also maintained its own bank account.

When the university published a list of the donations which it had received, it included therein in some if not all instances the donations which had been made to the foundation.

The parties have stipulated that during the years 1959 through 1963, inclusive, both the university and the foundation were organizations described in section 170(c)(2), I.R.C. 1954, and during the period each was listed as an exempt organization in the then "Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954," currently designated as publication No. 78 of the Department of the Treasury, Internal Revenue Service. The foundation filed annual information returns on Form 990, "Return of Organization Exempt from Income Tax under section 501(c)(1), (2), (4)–(16)," during all of its fiscal years 1959 through 1963, inclusive.

During the years 1959 through 1963, Mueller made annual distributions from earnings to the university for the benefit of the law school and semiannual payments to the foundation which the minutes of the meetings of its board of directors designated as "contributions." Mueller also made annual contributions of substantially smaller sums to a number of "standard" national, metropolitan, and community charities.

The largest such payment was an annual contribution of $2,500 to the Jersey City United Fund. The other contributions ranged from $750 to $10 and were made to such organizations as the Y.M.C.A., Y.W.C.A., United Jewish Appeal, Catholic Charities (Archdiocese of New York), Salvation Army, American Red Cross, American Cancer Society, and Hudson County Tuberculosis Health League. The record does not disclose that any of the recipient organizations promoted either legal education or the legal profession. The amounts of the foregoing payments were as follows:

| | "Distributions" to the university for benefit of the law school | "Contributions" to the foundation | Other contributions to charities |
| --- | --- | --- | --- |
| 1959 | $220,000 | $85,000 | $5,200 |
| 1960 | 220,000 | 85,000 | 5,445 |
| 1961 | 175,000 | 75,000 | 4,565 |
| 1962 | 225,000 | 85,000 | 5,310 |
| 1963 | 275,000 | 115,000 | 5,850 |

Each year "contributions" to the foundation were made in two separate payments. The first payment was made in June of each

year and was always in the amount of $35,000. The amount of the second payment was determined by Mueller's board of directors in November of each year and was paid during December. The amounts of these payments varied from year to year and were determined at the same time that the board of directors determined the amount of the annual distribution to the university for the benefit of the law school. The amounts thus payable to the foundation and the university were considered in conjunction with one another as is reflected by the fact that they were dealt with in a single sentence in the resolutions authorizing such payments. The minutes of the meetings of the board of directors for 1961 reflect the pattern that recurred during each of the years in issue:

May 12, 1961

The President recommended that a contribution of $35,000.00 be made to the Law Center Foundation. Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that a contribution of $35,000.00 be made prior to June 30, 1961, to the Law Center Foundation.

November 17, 1961

After discussion, upon motion duly made and seconded, it was unanimously RESOLVED, that there be distributed to the University for the benefit of the Law School prior to December 31, 1961, from earnings a sum of $175,000.00 and that there be contributed, prior to December 31, 1961, to the Law Center Foundation the sum of $40,000 supplementing the contribution of $35,000 made in June 1961.[15]

The minutes of a meeting of Mueller's board of directors on January 12, 1962, include the following:

The President read letters received from Carroll V. Newson, President of New York University, and Russell D. Niles, Dean of New York University School of Law, expressing appreciation for contributions of $175,000 made to the University and $75,000 to the Law Center Foundation during the year 1961.

During the years 1959 through 1963, there were five members of Mueller's board of directors. Three, H. Edward Toner, James L. Madden, and William R. Vanderbilt,[16] were "Class A" directors and hence the three trustees of the voting trust which held all of the Mueller stock. Toner and Madden had been for many years, close associates of Arthur T. Vanderbilt, the former dean of the law school and

---

[15] One deviation from the pattern is notable. The minutes of the meeting of the board of directors for Nov. 18, 1960, state:

"On motion made by Mr. Stillman and seconded by Mr. Madden it was unanimously

"RESOLVED, that there be *contributed* to the University for the benefit of the Law School prior to December 31, 1960 from earnings a sum of $220,000 and that there be contributed to the Law Center Foundation the sum of $50,000 supplementing the contribution of $35,000 made in June 1960." (Emphasis supplied.)

[16] During 1959 Vanderbilt succeeded John Gerdes as both a director and a voting trustee of Mueller.

progenitor of the Law Center, and William R. Vanderbilt was Dean Vanderbilt's son. Madden was also a trustee of both the foundation and the university. The two "Class B" directors during the period were W. Paul Stillman and C. Frederick Mueller. Like Madden, Stillman had been a close associate of Dean Vanderbilt and also served as a trustee of both the foundation and the university.

Mueller's bylaws were amended in 1966 to expand the size of its board of directors to nine members and to alter the restrictions applicable to its class A directors, as follows:

ARTICLE III

DIRECTORS

\*     \*     \*     \*     \*     \*     \*

Section 2.—The board of directors shall consist of nine persons elected annually by the stockholders; five of the directors shall be Class A directors and four shall be Class B directors.

\*     \*     \*     \*     \*     \*     \*

Section 4.—Vacancies among the Class A directors, whether caused by death or resignation, shall be filled by the remaining director or directors of such class. In filling vacancies among the Class A directors arising after September 7, 1966, as in this Section provided, *each Class A director shall at the time of his election be either a member of the Board of Trustees of the Law Center Foundation, or of the Board of Trustees of New York University.* However, any Class A director elected prior to September 7, 1966 shall be eligible for re-election to the Board of Directors as a Class A director. [Emphasis added.]

The requirement that new class A directors be, at the time of their election, trustees of either the foundation or the university was designed to ensure that the class A directors had a basic loyalty to and interest in the university. It was better calculated to achieve that objective than the less restrictive prior requirement, which permitted students, alumni, current and former faculty members, and current and former administration officials to be class A directors. Moreover, it reflected an understanding that the underlying objectives of the foundation and of Mueller were identical, namely, to benefit the School of Law of New York University.

From time to time, Dean Niles or Dean de Capriles made the law school's financial needs known to the members of Mueller's board of directors and at least impliedly suggested that the board do what it could to meet them. The record does not disclose that in thus making known the needs of the law school Dean Niles or Dean de Capriles distinguished between the needs of the foundation and the needs of the law school.

The foundation's charter provided that vacancies in the foundation's board of trustees would be filled by the university's board of trustees. However, generally successor trustees were recommended by the board of trustees of the foundation, and ordinarily its recom-

mendation was accepted by the university. During the years in issue, at least 10 of the 20 members of the foundation's board of trustees were also involved in the management of the university and the law school. At least 8 of the foundation's trustees (including Messrs. Madden and Stillman) also served as trustees of the university. Also among the foundation's trustees were Russell D. Niles, who served as dean of the law school for a period of 16 years (from 1948 until late 1964) and as a professor at the law school for a considerably longer period and Associate Dean Miguel de Capriles, a professor at the law school.[17] It also appears that approximately one-half of the foundation's trustees were university alumni.

In deciding how to make best use of the annual distributions made by Mueller to the university for the benefit of the law school, the university's board of trustees, as a matter of policy, sought the counsel of the foundation's trustees and ordinarily deferred to their advice. As a result, an understanding was reached that as long as there were mortgages outstanding on Vanderbilt Hall and Hayden Hall, a substantial part of the distributions from Mueller would be applied, by way of "rental" payments to the foundation, to retirement of the debt.

The foundation's board of trustees met about three or four times a year to evaluate proposals placed before it, select the programs which it would support, and determine how extensive its support would be. Proposals were made by board members and also by members of the law school faculty. However, at the meetings, Niles and de Capriles, as deans of the law school, and therefore the individuals most likely to understand its needs and its capabilities, exercised a disproportionate degree of influence.

Moreover, Deans Niles and de Capriles also served, respectively, as the foundation's executive vice president and secretary-treasurer during the years in issue. As executive vice president, Dean Niles was responsible for carrying out ministerial functions on behalf of the foundation between meetings of the board of trustees and for the foundation's efforts to solicit funds from other organizations.

The foundation received substantial contributions from donors other than Mueller. The following schedule of receipts reflects the relative amounts of such contributions during the fiscal years ending August 31, 1960, through August 31, 1963:

| FYE Aug. 31— | Payments from Mueller | Gifts from other sources | "Rental" income |
|---|---|---|---|
| 1960 | $85,000 | $120,000 | $566,258 |
| 1961 | 85,000 | 130,000 | 556,155 |
| 1962 | 75,000 | 75,000 | 549,363 |
| 1963 | 85,000 | 125,000 | 550,746 |

[17] Dean de Capriles became vice dean in 1963 and dean of the law school in 1964.

Among the other donors were law school alumni, who, in the law school's official fund-raising literature, were given the option of contributing either to the university or to the foundation. The following was a typical presentation of the alternative methods of making a donation:

Dean Niles, in expressing his gratitude for the bequests that have been made, cautioned graduates of the school about the correct corporate designation of the University. Neither the School of Law nor the Law Center is separately incorporated. Bequests should be made to New York University for the benefit of the School of Law, or in the alternative to Law Center Foundation for the benefit of the School of Law or of any of the Law Center programs.

The recommended form is as follows: "I give and bequeath _____ to New York University, a domestic corporation, organized in the State of New York by special charter enacted on the 18th day of April, 1831, and subsequently amended, for the benefit of its School of Law." Law Center Foundation is also a New York educational corporation and may be the recipient of gifts or bequests.

The message indicated no preference between the two methods and suggested no practical distinction between them. Other contributions to the foundation were made by national charitable organizations. The donations were frequently, if not always, solicited by Dean Niles, and a number of the organizations informed him that they would make contributions to the foundation, but not to the university. By making their payments to the foundation, and not directly to the university for the benefit of the law school, the organizations hoped to be able to support Law Center projects without inviting massive fund raising efforts by the representatives of other universities and law schools.

On its Federal income tax returns for the calendar years 1959 through 1963, inclusive, Mueller did not attempt to deduct the "distributions" made directly to the university, but it claimed the payments it had made to the foundation as deductible charitable contributions. In his deficiency notices to Mueller, the Commissioner disallowed the deductions and determined that the payments constituted in substance nondeductible dividend distributions to the university.

OPINION

RAUM, *Judge:* The only issue presented for decision is whether Mueller may deduct the payments it made to the foundation as charitable contributions pursuant to section 170, I.R.C. 1954.[18] The parties have stipulated that during the years in issue the foundation was an organization described in section 170(c)(2). Thus the question before us is whether the payments in issue were "contribution[s] or gift[s]"

[18] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.
(a) ALLOWANCE OF DEDUCTION.—
(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A

within the meaning of section 170(c), or whether, as the Commissioner contends, the payments, although cast in the form of contributions, were in substance nondeductible dividend distributions for the benefit of New York University rather than contributions or gifts.

This case is only the most recent round in a series of encounters in both judicial and legislative arenas over the proper tax treatment of businesses owned or operated by exempt organizations.[19] In 1950 this Court rejected Mueller's contention that it was completely exempt from taxation under section 101(6), I.R.C. 1939, merely because its income was destined to be paid over to a charitable corporation which in turn was exempt; the Court regarded as pivotal the fact that Mueller's sole activity was the conduct of a macaroni business, a regular competitive commercial enterprise. *C. F. Mueller Co.*, 14 T.C. 922. That decision, however, was reversed the following year in *C. F. Mueller Co.* v. *Commissioner*, 190 F. 2d 120 (C.A. 3). Congress had meanwhile enacted legislation in 1950 designed to prevent such abuses in the future,[20] and the Court of Appeals stressed the fact that Congress had specifically indicated that determinations as to whether an organization is exempt for taxable years beginning prior to January 1, 1951, should be made as though the new legislation had not been enacted. 190 F. 2d at 122.

Throughout the history of the 1950 legislation was the recurring note of disapproval of the unfair competitive position that could be attained in the conduct of a business enterprise if its income were to be exempt from taxation. An exempt corporation, it was thought,

---

charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) PERCENTAGE LIMITATIONS.—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) CORPORATIONS.—In the case of a corporation, the total deductions under subsection (a) for any taxable year shall not exceed 5 percent of the taxpayer's taxable income \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) A corporation, trust, or community chest, fund, or foundation—
  (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;
  (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;
  (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; \* \* \*

[19] Much of the legislative history has been outlined in *University Hill Foundation*, 51 T.C. 548, 562–566, on appeal (C.A. 9.) See also Note, "The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations," 81 Harv. L. Rev. 1280.
[20] Sec. 301 of Revenue Act of 1950, 64 Stat. 947. The substance of these provisions, to the extent here relevant, was later incorporated in secs. 511–515 of the Internal Revenue Code of 1954.

could reduce its prices below those which its tax-paying competitors could afford to charge if they were to realize a competitive rate of return on their invested capital. Alternatively, an exempt enterprise could charge the same prices set by its nonexempt competitors and either earn a higher rate of return or invest its profits (unreduced by corporate taxation) in improvements at a faster rate than could its competitors. H. Rept. No. 2319, 81st Cong., 2d Sess., pp. 36, 41 (1950) ; S. Rept. No. 2375, 81st Cong., 2d Sess., pp. 28, 35 (1950). In any event, the exempt enterprise was thought to pose the threat of unfair competition, and even monopoly.[21] The congressional remedy was to tax the "unrelated business income" of certain exempt organizations, that is, the income earned by "unrelated" businesses operated directly by exempt organizations, and to tax "feeder" organizations (separately incorporated, profit-making enterprises owned, like Mueller, by one or more exempt organizations) in the same manner as competitive corporations. Secs. 502, 511–515, I.R.C. 1954. The underlying purpose was to help to place both feeders and businesses operated directly by exempt organizations on a competitive basis with their tax-paying rivals.

Congress contemplated that such charity-run businesses would have available to them the same tax deductions which were available to their competitors, including the deduction for charitable contributions. Indeed, section 512(b)(10) specifically provides:

> (10) In the case on any organization described in section 511(a), the deduction allowed by section 170 (relating to charitable etc. contributions and gifts) shall be allowed (whether or not directly connected with the carrying on of the trade or business), but shall not exceed 5 percent of the unrelated business taxable income computed without the benefit of this paragraph.

At the same time, however, it was recognized that a charitable corporation operating a business directly could not retain tax-free any portion of its earnings for its own benefit or make a "contribution" to itself that would be deductible under these provisions. In this respect section 1.512(b)–1(g)(3) of the regulations explicitly provides:

> (3) The contribution, whether made by a trust or other exempt organization, must be paid to another organization to be allowable. For example, a university described in section 501(c)(3) which is exempt from tax and which operates an unrelated business, shall be allowed a deduction, not in excess of 5 percent of its unrelated business taxable income, for gifts or contributions to another university described in section 501(c)(3) for educational work *but shall not be allowed any deduction for amounts expended in administering its own educational program.* [Emphasis supplied.]

These regulations are scrupulously in accord with the understanding of Congress as revealed in the House and Senate committee reports

---

[21] "[I]f something is not done * * *, the macaroni monopoly will be in the hands of the universities." Hearings on Revenue Revision of 1950 before the House Committee on Ways and Means, 81st Cong., 2d Sess., pp. 579–580 (1950) (remarks of Rep. Dingell).

relating to the statutory provisions (H. Rept. No. 2319, 81st Cong., 2d Sess., p. 111 (1950); S. Rept. No. 2375, 81st Cong., 2d Sess., p. 109 (1950)):

The contribution, whether made by a trust or other exempt organization, must be paid to another organization to be allowable. For example, a section 101(6) [1954 Code, sec. 501(c)(3)] incorporated educational institution operating an unrelated business would be allowed a deduction up to 5 percent of its unrelated business net income for amounts of income from any source paid over to the Red Cross but would not be allowed any deduction for amounts which are used to defray its own expenses in administering its own educational program.

To be sure, the foregoing regulations and committee reports dealt only with businesses operated directly by charitable organizations, but the deductibility of a purported contribution by a feeder to its exempt stockholder was squarely placed in issue in *Crosby Valve & Gage Co.* v. *Commissioner*, 380 F. 2d 146 (C.A. 1), affirming 46 T.C. 641. In holding that such payments or contributions are not deductible, the First Circuit reasoned that, whether the charitable organization operates the business directly or through a subsidiary, the same policies which moved Congress to enact the 1950 legislation also required disallowance of the claimed deduction. If a feeder could make deductible payments to its exempt stockholder, the court explained, it would be able to distribute earnings to its owner at a lower aftertax cost than could corporations not owned by exempt organizations, which ordinarily made nondeductible dividend distributions to their stockholders. The potential competitive advantages were the same possibilities which had prompted the 1950 legislation: a higher rate of return on capital, price-cutting which would drive out competition by tax-paying enterprises, or corporate expansion at a faster rate than could be afforded by competitors—simply because a feeder could deduct up to 5 percent of its earnings by distributing that amount to its exempt stockholder and calling it a charitable contribution rather than a dividend. The claimed deduction was therefore disallowed. In response to the taxpayer's argument that disallowance of the deduction would place the feeder in a worse position than its competitors, which could make deductible charitable contributions to the feeder's exempt parent, the court responded that a feeder could "take full advantage of the deduction by contributing to any *other* charity. Its universe is decreased by only one member." 380 F. 2d at 149. Moreover, if the deduction were allowed, a discrimination would result in favor of business income earned by a feeder as against identical business income earned directly by the charitable organization itself—a result that finds support nowhere in the legislative objectives which the statute was designed to attain.

Petitioner's contentions herein may conveniently be divided into three main points: (1) That *Crosby* was incorrectly decided; (2) that

*Crosby* is not applicable to the present situation where Mueller's stock was held by voting trustees for the benefit of New York University rather than by New York University directly; and, finally, (3) that *Crosby* is in any event not controlling since the payments in controversy were made to the foundation rather than to New York University. We hold that petitioner is not entitled to prevail on any of these grounds.

1. When *Crosby* was before this Court, the majority opinion relied not only upon the legislative purpose of the statutory provisions, but also to a considerable extent upon such cases as *Harold DeJong*, 36 T.C. 896, affirmed 309 F. 2d 373 (C.A. 9), and *Commissioner* v. *Duberstein*, 363 U.S. 278, dealing with the meaning of "gifts" and "charitable contributions" in other contexts. Upon appeal, the First Circuit disapproved our reliance upon *DeJong* and *Duberstein* (380 F. 2d at 146–147), but it affirmed upon what it referred to as the "alternative ground" for our decision, namely, the legislative background and statutory treatment of unrelated business income of exempt organizations (380 F. 2d at 149):

Whether the charity operates the business directly or through a subsidiary, the economic and competitive implications of allowing a deduction for income that in fact is retained by the charity would be the same. In each case, either the charity would receive a greater return on its investment in its business than a non-charity, which could allow it to expand that business with less recourse to external financing, or the business itself would have a critical "cushion", allowing it to cut prices, increase services, etc., to the disadvantage of non-charity-linked competitors.[3]

* * * were petitioner's deductions to be allowed it would be able to make a partially tax-free distribution of its earnings to its sole shareholder—something denied to its competitors and clearly contrary to the approach to the tax treatment of "feeder" organizations taken by section 502 of the Internal Revenue Code.[4] In sum, we conclude that the transfer in this case must be treated as a non-deductible dividend under section 316.

[Footnotes omitted.]

It is not necessary here to reevaluate the controversial *DeJong-Duberstein* ground,[22] for we are fully satisfied that *Crosby* was correctly decided on the other ground, approved and so clearly articulated by the First Circuit. Moreover, we note further that *Crosby* has been followed in the only cases that have since dealt with the issue. *Sid Richardson Carbon & Gasoline Co.* v. *United States*, 416 F. 2d 867 (C.A. 5); *United States* v. *Knapp Brothers Shoe Manufacturing Corp.*, 384 F. 2d 692 (C.A. 1), certiorari denied 390 U.S. 989.[23] We find no substance in petitioner's contention that the First Circuit's

[22] Cf. *United States* v. *Transamerica Corp.*, 392 F. 2d 522, 524 (C.A. 9); *Stubbs* v. *United States*, 428 F. 2d 885, 887 (C.A. 9); *Sarah Marquis*, 49 T.C. 695, 702.

[23] See also Rev. Rul. 68–296, 1968–1 C.B. 105. Moreover, the same result has recently been reached in a Memorandum Opinion of this Court. *Dave Investment Co.*, T.C. Memo. 1970–291 (Oct. 13, 1970).

opinion in *Crosby* confused the provisions of section 502, which taxes "feeder" organizations at the usual corporate rates, with the provisions of sections 511–515, which tax the "unrelated business income" of certain exempt organizations. Petitioner urges that since the feeder provisions require only that separately incorporated feeder organizations be taxed in the same manner as competitive corporations and since the unrelated business income provisions apply only to unrelated trade or business carried on directly by exempt organizations, these sections do not apply to charitable payments made by a separately incorporated feeder organization to its exempt parent. The argument is without merit. The feeder provisions and the unrelated business income provisions were relied upon in *Crosby*, not because they expressly governed the specific issue before the Court, but because they reflected a congressional policy that a profit-making enterprise operated by an exempt organization should be taxed in the same manner as its "noncharitable competitors"—regardless of whether it is operated directly by the exempt organization or is separately incorporated. Both our opinion and the First Circuit's opinion in *Crosby* interpreted "charitable contribution" in section 170(c) and "dividend" in section 316(a) in light of that policy.

In arguing that *Crosby* misconstrued the statute, petitioner professes to find support in congressional understanding which it contends is reflected in certain provisions of the Tax Reform Act of 1969. The contention is highly ingenious and fine-spun, but we do not find it convincing. In general, the 1969 amendments were intended merely to remove certain discrepancies in treatment of income of feeders and income of businesses directly operated by the otherwise exempt charities, where the particular discrepancies were theretofore required by certain *specific statutory provisions*.[24] The purpose of the amendments was to correct the disparate results which existed theretofore as a consequence of those specific statutory provisions.

Petitioner urges that the failure of Congress in 1969 to deal similarly with the present problem demonstrates that it was content to leave the alleged discrepancy alone. But the situations are not analogous. In the present case there were no specific statutory provisions explicitly creating a disparity of treatment that required correction, and indeed the only decisions dealing with the matter (*Crosby, Knapp Brothers Shoe*, and *Sid Richardson*, all *supra*) held that contributions by a feeder to its exempt stockholder were to be treated in the same manner as amounts retained or utilized by an exempt organization

---

[24] Thus, pursuant to sec. 513(a)(1) and (3) of the 1954 Code, the unrelated business income tax did not apply to a business in which substantially all the services were performed without compensation or to a business (e.g., a thrift shop) which sold merchandise, substantially all of which was received as the result of contributions. Sec. 121(b)(7) of the 1969 Act amended sec. 502 of the Code to accord parallel treatment for such situations in the case of feeders. 83 Stat. 542.

for its own charitable purposes from an unrelated business which it conducted directly. Accordingly, there was no such analogous discrepancy calling for legislative correction, and we cannot find in the silence of Congress in these circumstances any expression of purpose looking towards the support of any such result as is urged by petitioner.[25] We refuse to depart from *Crosby*, particularly since the result there reached has since been approved and applied in two other reported cases, namely, *United States* v. *Knapp Brothers Shoe Manufacturing Corp.*, *supra*, and *Sid Richardson Carbon & Gasoline Co.* v. *United States*, *supra*, as well as in a recent Memorandum Opinion of this Court (see fn. 23 *supra*).

2. Petitioner contends further that *Crosby* is distinguishable because, as a result of the voting trust arrangement, the university did not own or control Mueller. We think that the argument is unsound.

---

[25] In addition, petitioner points to sec. 512(b)(15), I.R.C. 1954, which was also introduced by the 1969 legislation. Sec. 121(b)(2)(C) of the Tax Reform Act of 1969, 83 Stat. 539. That section eliminated the preexisting exclusion from unrelated business income of certain interest, annuity, royalty, and rent payments to exempt organizations. See also sec. 121(b)(2)(A) of the 1969 Act (which replaced prior Code sec. 512(b)(3)). The House report summarized both the problem and the statutory remedy (H. Rept. No. 91–413 (Pt. 1), 91st Cong., 1st Sess., p. 49 (1969)):

"In certain cases exempt organizations do not engage in business directly but do so through nominally taxable subsidiary corporations. In many such instances the subsidiary corporations pay interest, rents or royalties to the exempt parent in sufficient amount to eliminate their entire income, which interest, rents, and royalties are not taxed to the parent even though they may be derived from an active business.

"This problem is remedied under the bill by removing the exemption from the unrelated business tax for passive income if it is in the form of interest, rents, and royalties received from controlled corporations."

See also S. Rept. No. 91–552, 91st Cong., 1st Sess., p. 73 (1969). Petitioner emphasizes that since Congress remedied the problem by taxing the exempt organization on the payments in question, rather than by disallowing the subsidiary a deduction for all or part of those payments, Congress thus made it clear that the deductibility of any payment made by a separately incorporated subsidiary to its parent corporation should not be disallowed solely because its parent happens to be an exempt organization. Therefore, petitioner argues, a charitable contribution, like a rent payment, made to the exempt parent should be deductible by the subsidiary. We are not convinced.

Sec. 512(b)(15) does not apply to all payments made by subsidiaries of exempt organizations. By its terms, it applies only to "interest, annuities, royalties, and rents" and not to charitable contributions or dividends. Moreover, sec. 512(b)(15) was introduced in order to fill a gap in the statute which prior judicial decisions had declined to fill. See, e.g., *University Hill Foundation*, 51 T.C. 548, on appeal (C.A. 9). In contrast, at the time of the 1969 legislation, the deductibility of "charitable contributions" made by a feeder to its exempt parent had been denied in every case considering the question. Finally, petitioner's argument actually supports the Commissioner's position. If the deductibility of any payment made by a separately incorporated subsidiary to its exempt parent does not depend upon the exempt status of the parent organization, as petitioner suggests, then it would follow that any payment made by the subsidiary to its exempt parent without consideration should be treated as a dividend, as would such a payment made by any other subsidiary to its nonexempt parent.

Sec. 512(b)(15) was designed merely as a practical remedy for a very specific type of abuse and it would be perilous to attempt to derive from those provisions any such general principle as petitioner seeks to extract therefrom. Indeed, if any principle at all is reflected in the amendment, it is that Congress was opposed to abuses of this general character, and therefore saw no need to make any changes in the statute in respect of the present problem in view of the fact that judicial decisions had shown that such abuses had already been effectively dealt with in existing legislation as construed by the courts.

The voting trustees had no beneficial interest whatever in petitioner's stock, and indeed each was to remain a stockholder only so long as he remained a class A director of Mueller. Further, as our findings reveal, class A directors were to be chosen from such specified sources as would tend to ensure their basic loyalty to the university. They were thus persons who could be counted upon to make effective the provisions of Mueller's charter that no part of its income should inure to the benefit of anyone other than "New York University for the exclusive benefit of its School of Law." The charter provision that no stockholder was to be "entitled to dividends on his shares" was obviously intended to prevent any corporate distribution for the benefit of the "legal" owners of the stock, i.e., those persons in whose names the outstanding 10 shares of Mueller were registered. And while it is true that the university probably could not compel distribution of a dividend at any particular time, the charter made clear that the corporation's income and property could be distributed only to the university for the exclusive benefit of its law school, whether upon liquidation or otherwise. This arrangement made it inevitable that whatever financial success Mueller enjoyed would ultimately redound to the benefit of the law school. No one other than the university had any beneficial interest in the stock, and the charter provisions as well as the very nature of the class A directors and voting trustees were such as to ensure such dividend distributions from time to time to the university as would be compatible with sound business management of the corporation.

The various arguments made by petitioner on this aspect of the case were made and rejected in *United States* v. *Knapp Brothers Shoe Manufacturing Corp.*, 384 F. 2d 692 (C.A. 1), certiorari denied 390 U.S. 989, where New York University bore substantially the same relationship to a successful shoe manufacturing corporation that it bears to Mueller in the present case: the stock in *Knapp* was held by voting trustees who were never entitled to any dividends or corporate assets, and the sole distributee of both income and property, irrevocably in perpetuam, was New York University.[26] In deciding that the voting trust arrangement before it did not require a different result from that reached in *Crosby*, the court stated (pp. 693–694):

In the case at bar taxpayer argues that the University is neither "owner" nor "shareholder," and that the *Crosby Valve* rationale is therefore inapplicable. "[T]he *owners* of appellee," it urges, "are the voting trustees, who, under the voting trust instruments, are vested with both legal and beneficial ownership

---

[26] Indeed, in *Knapp,* contributions were made for the benefit of the university's medical center (identified as "New York University—Bellevue Medical Center"), an unincorporated department of the university comparable to the Law Center. See 265 F. Supp. 133, 135 (D. Mass.). See also *infra* p. 307.

of the stock. The University is a beneficiary, if at all, only in the narrow sense of being entitled to any corporate profits or assets when and if the voting trustee-elected directors choose to bestow them." We cannot agree. In fact, we would describe the substance of the situation as precisely the reverse. It is the University which possesses the real beneficial interest. It is the stockholders group that "is a beneficiary, if at all, only in the narrow sense," viz., of being entitled to choose when to bestow the profits. They neither have nor can have any interest or purpose apart from the ultimate interest of the University.[2]

Taxpayer argues that the University may never receive any funds from it; that the stockholders may retain all profits in the company, and the company, instead of succeeding, may go bankrupt. Initially this overlooks the fact that the University has already received the substantial profits which are presently involved. More fundamentally, if it never receives further payments it will be because there are no profits or assets to distribute, not because they are distributable to someone else. The possibility that no one will benefit from the operations of the taxpayer does not alter the fact that if any profits do become payable, they are payable to the University.[3]

[Footnotes omitted.]

We hold in this case that the university was the sole beneficial owner of Mueller and that the existence of the voting trust agreement does not require here, any more than in *Knapp*, a different result from that reached in *Crosby*. Were we to hold otherwise, Mueller would be able to make deductible distributions of earnings to the university, the only entity entitled to its dividend distributions, and thereby enjoy an advantage not shared by those of its competitors which may make only nondeductible dividend distributions to their nonexempt shareholders. See *Sid Richardson Carbon & Gasoline Co.* v. *United States*, 416 F. 2d 867, 869 (C.A. 5).

3. Nor is a different result required by reason of the fact that the "contributions" in issue were made to Law Center Foundation rather than directly to the university itself for the benefit of the law school. We do not suggest that the foundation was not a viable entity, nor do we characterize it as a "sham." But we are fully satisfied on the entire record as indicated by our detailed findings in this respect that the foundation was merely an instrumentality of the university, organized and operated exclusively for the benefit of the law school in the light of its expanded and expanding role in legal education as reflected by the new label (Law Center) with which it was identified. The payments to the foundation were thus for the exclusive benefit of the university and must therefore be treated as though they were made directly to the university. The result is supported by a long line of cases—although arising in quite different contexts—which hold that payments by a corporation for the benefit of its stockholders, regardless of whether they are made to third parties, are to be treated as distributions of dividend.[27]

---

[27] See, e.g., *Security First Nat. Bank of Los Angeles*, 28 B.T.A. 289, 298–299, 310–311, acq. XII–2 C.B. 12 and nonacq. XII–2 C.B. 25, where a corporation, at the instigation of

That the foundation was in fact merely an instrumentality of the university and that it was conceived and functioned exclusively for the benefit of the university can hardly be open to serious question upon a study of the record before us. We do not intend to enter into any comprehensive discussion of the evidence, nor is it necessary to re-canvass our extensive findings in this connection. A brief summary of some of the highlights should suffice.

The foundation was the successor to the university's wholly owned Law Center, Inc., which was formed solely as a vehicle to obtain financing for the construction of the Law Center building without pledging the long-term credit of the university. The university had transferred cash to Law Center, Inc., with which to purchase the land (already contracted for by the university), and that land when acquired, together with all other assets owned by it, was in turn transferred by Law Center, Inc., to the foundation. It then became the foundation's mission primarily, to finance the construction of the new physical plant for the benefit of the law school, and secondarily, to furnish funds for some of the programs to be conducted at the Law Center. These were solely university functions.

The relationship between the university and the foundation was rather clearly indicated in the affidavit which accompanied the foundation's application to the Commissioner of Internal Revenue for a determination that it was an exempt organization. The affidavit referred to the filing of plans for the "erection * * * of a building to house the School of Law of New York University," and continued:

The plans for future activities in furtherance of the purposes set forth in our charter include the removal to the new building when completed of the School of

---

its sole stockholder, transferred land to a trust under the stockholder's control. The trust was organized as a library, art gallery, museum, and botanical garden, and the transfer was made so that the trust might exchange the land for certain objects of art which the stockholder wanted it to acquire. In holding that the purported "gift" of land to the trust was a dividend to the stockholder, the Court stated (p. 311) :

"The corporation acted solely to accommodate the * * * [stockholder]. At the end of the day the earned surplus of the corporation was reduced by the book value of the land, the trust had the art objects, and the * * * [stockholder] had fully accomplished his sole purpose in having the transfers made. Although it may not be important, it is a fact also that through his absolute dominion over the personal property of the trust, he was in control of the art objects. He enjoyed the use of the corporate property and obtained what he wanted to buy. For income tax purposes the transaction amounted to the distribution of a dividend to the * * * [stockholder]. Cf *L. J. Christopher,* 13 B.T.A. 729 ; affd., 55 Fed. (2d) 527."

See also, e.g., *Jaeger Motor Car Co.* v. *Commissioner,* 284 F. 2d 127 (C.A. 7), affirming a Memorandum Opinion of this Court, certiorari denied 365 U.S. 860 ; *Clark* v. *Commissioner,* 84 F. 2d 725 (C.A. 3), affirming 31 B.T.A. 1082 ; *Eugene A. Mohr,* 45 T.C. 600 ; *Challenge Manufacturing Co.,* 37 T.C. 650 ; *Irving Sachs,* 32 T.C. 815, affirmed 277 F. 2d 879 (C.A. 8), certiorari denied 364 U.S. 833 ; *American Properties, Inc.,* 28 T.C. 1100, 1114–1115, affirmed 262 F. 2d 150 (C.A. 9) ; *Louis H. Zipp,* 28 T.C. 314, affirmed 259 F. 2d 119 (C.A. 6), certiorari denied 359 U.S. 934 ; *Louis Greenspon,* 23 T.C. 138, 148–152, affirmed on this point but reversed on other grounds 229 F. 2d 947 (C.A. 8) ; *Montgomery Engineering Co.* v. *United States,* 230 F. Supp. 838 (D. N.J.), affirmed per curiam 344 F. 2d 996 (C.A. 3). Cf. *David G. Baird,* T.C. Memo. 1969–67, on appeal (C.A. 3).

Law of New York University * * *, and conducting the School in such new building and the removal and conduct of the Graduate School of Law and the establishment and conduct of various Law Institutes and conducting related activities all under the general supervision of the Council (governing body) of New York University, by which Council all Trustees of Law Center Foundation are elected annually.

6. It is contemplated that the building when completed will remain the property of Law Center Foundation which is closely affiliated with New York University by reason of the fact that by provision of the charter of the Foundation the University elects the Trustees of the Foundation, fixes their terms of office and fills any vacancies which may occur, and that in the event of the dissolution of the Foundation any and all property belonging to the Foundation must be transferred to New York University or to such educational organization or organizations as the Council of the University shall determine, subject to the approval of the Supreme Court of the State of New York, as provided by law.

The substantial identity of objectives of the foundation with those of the law school is also indicated by the fact that in its fund-raising literature, the law school gave its alumni the option of making their contributions to the university or to the foundation. And, at least during the campaign to raise funds for Vanderbilt Hall, the university transferred the contributions which it received to the foundation. Also, the connection and unity of purpose between the law school and the foundation is further suggested by the minutes of the January 12, 1962, meeting of petitioner's board of directors at which letters were read from the president of the University and dean of the law school "expressing appreciation for contributions of $175,000 made to the University and $75,000 to the Law Center Foundation during the year 1961."

It is not necessary to delve further into the evidentiary materials to indicate additional factual support for our conclusion. We are wholly unpersuaded by petitioner's intensive efforts to establish that the foundation as an "independent entity" was not necessarily operated for the benefit of the university. We find the contrary to be true, taking into account, of course, the fact that the mission of a university law school may be an expanding one and may embrace programs that might generally be considered outside its proper scope if measured by the standards of an earlier day.[28]

Although not conclusive, we think it appropriate to add a further word about the timing and amounts of Mueller's "contributions" to the

---

[28] In arguing that the foundation was engaged in sponsoring programs outside the scope of the law school, and therefore not for the benefit of the university, petitioner places special stress upon the foundation's support of the so-called Citizenship Clearing House. While it is probably true that this program may perhaps be regarded as rather "far out" for an American law school, it must nevertheless be remembered, as shown in our findings, *supra* p. 281, that the Citizenship Clearing House was already an actively functioning program under the aegis of the law school prior to the creation of the foundation. In the circumstances, it certainly cannot be said that the foundation's participation in that program represented anything other than the support of a program that was theretofore properly conducted by the law school itself.

foundation, which suggest that they resembled dividends more closely than they did charitable contributions. Each June, Mueller made a $35,000 payment to the foundation, but the amount of its second annual payment was not determined until November, at the same time that Mueller's board of directors determined the amount of its annual dividend distribution to the university. The resulting fluctuation in the amount of the total annual "contribution" to the foundation was roughly in line with the fluctuation in the amount of the annual distribution to the university. The timing and the fluctuation of the payments indicate to us that the "contributions" and the "distributions" were functionally equivalent. Furthermore, the great disparities between the size of Mueller's payments to the foundation and the size of its contributions to other exempt organizations also suggests that the payments to the foundation were not ordinary charitable contributions. Thus, the "contributions" to the foundation in 1959 were $85,000, whereas the total of all of its other contributions (to a number of organizations like the local United Fund, Red Cross, Salvation Army, etc.) amounted to only $5,200. Taking into account the identity of purpose of the foundation with the law school and the fact that petitioner's charter explicitly required that it be operated for the exclusive benefit of the law school, it is perfectly obvious that the disproportionately large payments to the foundation were no ordinary charitable contributions but rather reflected merely a further effort by the petitioner's board of directors to be faithful to the stated objectives of the charter.

One final note. In *United States* v. *Knapp Brothers Shoe Manufacturing Corp.*, *supra*, the "contributions" in issue were made both to New York University (the taxpayer's beneficial owner) and to New York University—Bellevue Medical Center, an administrative unit of the university. See 265 F. Supp. 133, 135 (D. Mass.). As we noted above, the First Circuit followed *Crosby*, *supra*, and held that the payments did not qualify as deductible charitable contributions. 384 F. 2d 692 (C.A. 1). There, as in the present case, the payments in controversy were for the benefit of the university. A different result is not called for here simply because the foundation, unlike the Medical Center, was separately incorporated. The foundation was an instrumentality of the university and functioned exclusively for its benefit. That the foundation was separately incorporated, while the medical center was not, was the consequence of considerations which appear to have little or no bearing on the issue herein. Indeed, the only evidence before us as to the reason one was incorporated while the other was not is testimony to the effect that New York University had a different president on each occasion, thus suggesting that the resulting decision

whether or not to incorporate turned largely upon the personal caprice or unexplained desires of the particular man in office at the time.

We hold that petitioner's payments to the foundation were for the benefit of the law school and therefore constituted distributions of dividends to the university regardless of how they were labeled; they were not deductible charitable contributions.

*Decisions will be entered under Rule 50.*